**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 21 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT LEROY BRYAN,

　　　　　Petitioner-Appellant,

v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

　　　　　Respondent-Appellee.

No. 00-6090

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-97-1967-R)**

---

Robert A. Nance of Riggs, Abney, Neal, Turpen, Orbison & Lewis (F. Andrew
Fugitt, with him on the briefs), Oklahoma City, Oklahoma, for Petitioner-
Appellant.

David M. Brockman, Assistant Attorney General (W.A. Drew Edmondson,
Attorney General of Oklahoma, with him on the briefs), Oklahoma City,
Oklahoma, for Respondent-Appellee.

---

Before **TACHA** , Chief Judge, **SEYMOUR** , **EBEL** , **KELLY** , **HENRY** ,
**BRISCOE** , **LUCERO** , **MURPHY** , **HARTZ** , and **O'BRIEN** , Circuit Judges. *

---

*Judges Michael W. McConnell and Timothy M. Tymkovich joined the
court after oral argument in the instant case and did not participate in this
decision.

**MURPHY** , Circuit Judge.

## I. INTRODUCTION

Robert Leroy Bryan was convicted in Oklahoma state court of first degree malice murder and sentenced to death. *See Bryan v. State (Bryan I)*, 935 P.2d 338 (Okla. Crim. App. 1997). After the Oklahoma Court of Criminal Appeals denied his state petition for post-conviction relief, *see Bryan v. State (Bryan II)*, 948 P.2d 1230 (Okla. Crim. App. 1997), Bryan filed the instant 28 U.S.C. § 2254 habeas petition in federal district court, alleging, *inter alia*: (1) the state failed to adduce sufficient evidence to support his conviction for first degree malice murder; (2) counsel labored under a conflict of interest; (3) counsel was ineffective at both the guilt and penalty phases of his trial because counsel failed to present mental health evidence; and (4) he was incompetent to stand trial. The district court denied relief. A panel of this court unanimously concluded that Bryan was not entitled to relief on his evidence-sufficiency, conflict of interest, and competency claims. *See Bryan v. Gibson (Bryan III)*, 276 F.3d 1163, 1166-68, 1172-75, 1168-72 (10th Cir. 2001); *id.* at 1179, 1180 (Henry, J., concurring in part and dissenting in part). The panel, although divided, further held that trial counsel had not rendered ineffective assistance during either the guilt or penalty phase of the trial by failing to present mental health evidence. *Compare id.* at

1172-79 (panel majority), *with id.* at 1182-85 (Henry, J., concurring in part and dissenting in part).[1]

A majority of the active judges of this court ordered the case reheard *en banc* and requested that the parties brief whether trial counsel rendered constitutionally ineffective assistance when he failed to present evidence of Bryan's mental illness "during either the guilt or penalty phases of the trial."[2] Upon consideration of the parties' briefs and submissions, we **vacate** that portion of the panel opinion addressing Bryan's claim of ineffective assistance of trial counsel, *see id.* at 1175-79, and **affirm** the denial of habeas relief for the reasons set out below. We do not reconsider as an *en banc* court the panel's denial of habeas relief as to Bryan's evidence-sufficiency, competency, or conflict of interest claims. *See id.* at 1166-68, 1168-72, 1172-75. Accordingly, all remaining portions of the panel opinion remain undisturbed.

---

[1]As to Bryan's argument that his counsel rendered ineffective assistance during the guilt phase of the trial, Judge Henry simply indicated as follows: "I believe that counsel was ineffective in the guilt phase, but I will concentrate on Mr. Bryan's best argument: that he received unreasonably ineffective assistance in the all-important 'second' or 'sentencing phase.'" *Bryan III*, 276 F.3d at 1180 (Henry, J., concurring in part and dissenting in part).

[2]In his supplemental brief before the *en banc* court, Bryan focuses exclusively on the question whether his trial counsel was ineffective in failing to present potentially mitigating mental health evidence during the penalty phase of the trial. He does not address at all whether counsel was constitutionally ineffective during the guilt phase of the trial.

## II. BACKGROUND

*A. Factual Background*

The evidence presented at trial linking Bryan to the murder of his aunt, Inabel Bryan, was almost entirely circumstantial. Inabel disappeared from her home in September of 1993. A neighbor found tire marks at Inabel's home matching the tracks of a car Bryan had rented at that time. A potted plant was also found at Inabel's home; Bryan purchased that plant the day Inabel disappeared. Police found Inabel's body, and a receipt for the purchase of the plant, several days after her disappearance on a parcel of property owned by Bryan's parents. Inabel died from a gunshot wound to the forehead; a pillowcase was duct-taped over her head. There was a single set of vehicle tracks present at the scene; the tracks matched the tread pattern of the right rear tire on Bryan's rental car.

Authorities searched the property where Inabel's body was found because, several years earlier, Bryan had solicited an undercover police officer to kidnap and kill a local banker and dump the body at the same location. This solicitation scheme included plans to force the banker to sign a number of fraudulent promissory notes and personal checks. Similarly, in this case, Bryan possessed several handwritten promissory notes and agreements in which Inabel purportedly agreed she owed him millions of dollars as a result of an investment in his failed

businesses. A handwriting expert testified Bryan wrote the agreements and forged Inabel's signature. Police also found in Bryan's possession several of Inabel's personal checks. According to the expert, Bryan had forged Inabel's signature on one of the checks and had made four others signed by Inabel payable to himself in varying amounts. Police found Inabel's checkbook just outside the Bryan home, burned in a can of ashes.

Before Inabel's disappearance, Bryan rented a car from a local dealership. When making the arrangements, he requested a car with a large trunk. When he returned the car two days after Inabel's disappearance, he could not pay the rental fee. He did, however, show the owner of the dealership one of the forged checks. Police found a hair in the trunk similar to the hair of the victim. They also found grass and vegetation, like that on the property where Inabel's body was discovered, throughout the car's undercarriage. Fibers lining the trunk were similar to those on Inabel's clothes and tape found on or near her body.

Police located additional evidence in Bryan's bedroom tying Bryan to the murder. They discovered a roll of duct tape of the same type as pieces found near Inabel's body and on the pillowcase over her head. An expert testified that the edges of the tape taken from Bryan's bedroom matched the edges of one of the pieces of tape near Inabel's body. Police also found ammunition in Bryan's bedroom consistent with the type of ammunition used to kill Inabel and

consistent with a bullet in the rental car. A metallurgy study indicated that all the bullets—the one that killed Inabel, the one in the rental car, and the ones in the Bryan home—were manufactured at the same time and could have come from the same box.

*B. Additional Background*

The issues before this court turn on evidence of Bryan's mental health at the time of the murder and the non-use of that evidence during both the guilt and penalty phases of Bryan's trial. As a consequence, some brief additional background is in order.

Bryan has a history of organic brain disease, possibly related to his severe case of diabetes mellitus, dating back to his mid-twenties. In 1989, when Bryan was forty-nine-years-old, he was charged with solicitation of murder relating to the scheme to kidnap and kill the banker described above. He was initially found incompetent to stand trial and was sent to Eastern State Hospital in March of 1989 for treatment. Bryan was diagnosed as suffering from an organic delusional disorder and was considered severely psychotic at the time of his admission to the hospital. Doctors also discovered that Bryan's brain exhibited significant signs of atrophy. Doctors treated Bryan's diabetes and medicated him with Navane, an antipsychotic drug, until Bryan was determined competent in 1990.

After Bryan was charged in 1993 with Inabel's murder, Bryan's family hired Raymond Munkres to represent Bryan. At the arraignment, Munkres expressed serious doubt as to Bryan's competency and made an oral motion for a competency determination. A jury trial on the question of Bryan's competency was eventually held on December 30, 1993. Because it was beyond the financial resources of Bryan's family, Munkres did not present any medical testimony at the hearing. Instead, Munkres adduced the testimony of Mike Jackson, an individual who volunteered his services to Munkres as an investigator. The essence of Munkres' presentation at the competency hearing was that Bryan was incompetent because the version of events he described surrounding the murder had no basis in reality, but that Bryan nonetheless sincerely believed in the veracity of his version of events. The jury concluded that Bryan had failed to demonstrate that he was incompetent to undergo further criminal proceedings.[3]

On January 3, 1994, just four days after the competency trial was completed, Bryan filed a letter with the trial court indicating as follows: "I wish to advise the court that as [of] this date I am dismissing my attorney of record

---

[3]This competency hearing failed to comply with the dictates of the United States Supreme Court's decision in *Cooper v. Oklahoma*, 517 U.S. 348 (1996), because Bryan was required to prove his incompetence to stand trial by clear and convincing evidence. *See Bryan I*, 935 P.2d at 347. Accordingly, a retrospective competency hearing was conducted in 1996 utilizing the proper preponderance-of-the-evidence standard; Bryan was also found competent during this proceeding. *See id.*; *Bryan III*, 276 F.3d at 1168-72.

because of philosophical differences in how this case should proceed in my best and most aggressive defense to the charges leveled against me." The trial court allowed Munkres to withdraw from the case and appointed the Oklahoma Indigent Defense System ("OIDS") to represent Bryan.

Wesley Gibson of the OIDS replaced Munkres as Bryan's attorney. Like Munkres, Gibson could not verify Bryan's version of the events surrounding the murder. Gibson hired Dr. J.R. Smith, a board-certified psychiatrist, to evaluate Bryan. It was Dr. Smith's opinion that Bryan's "delusional system and circumstantiality of thought (as well as the fluctuating blood sugar levels) affect his ability to assist his attorney in his own defense. He produces volumes of information that are irrelevant and often erroneous (but believed by the patient)." Based on the information provided by Dr. Smith, Gibson requested a second competency hearing. At a hearing on the application, the trial court considered the testimony of Gibson and the sheriff in charge of the jail where Bryan was housed, as well as the affidavit of Dr. Smith. The trial court denied the application for a new competency hearing, concluding that there was no doubt that Bryan was then competent.

Gibson continued to represent Bryan until May of 1994, when he had a slight stroke. He was replaced by Steven Hess, also of the OIDS. Hess continued to consult medical experts and hired Dr. Philip Murphy, a clinical

-8-

psychologist, to evaluate Bryan. Based on an evaluation which included numerous psychological tests and a review of relevant medical records, Dr. Murphy concluded as follows: "Mr. Bryan suffers from a serious mental disorder which places into serious question his competence to stand trial, as well as his legal culpability in the crimes for which he is charged."

Based on the opinions expressed by Drs. Smith and Murphy, and the two unsuccessful attempts to challenge Bryan's competency, Hess thought it was in Bryan's best interest to utilize an insanity defense rather than to continue to litigate the competency issue. Accordingly, Hess filed a notice of intent to rely on the insanity defense and a witness list setting out expert witnesses, including particularly Drs. Smith and Murphy, in support of such a defense. When Hess informed Bryan and his parents that he intended to utilize an insanity defense, both Bryan and his parents expressed their disapproval. Shortly thereafter, Bryan and his parents informed Hess that he would be replaced by privately retained counsel. In so doing, they indicated that Hess was being replaced because he had filed the notice to rely on an insanity defense.

Hess was replaced by Jack Freeman. Freeman contacted Hess and indicated that he would be Hess' replacement. He also set up a meeting with Hess and the medical experts. Hess turned over Bryan's file to Freeman, including all of the records and expert reports on Bryan's mental health.

Freeman did not ultimately present any mental health evidence during either the guilt or penalty phase of Bryan's trial, although he arranged for Dr. Murphy to be available in case his testimony would be helpful during the guilt phase of the trial.

## III. ANALYSIS

*A. Standard of Review*

On direct appeal to the Oklahoma Court of Criminal Appeals ("OCCA"), Bryan asserted that Freeman was ineffective during both the guilt and penalty phases of the trial because he failed to present evidence of Bryan's mental illness.[4] Contemporaneously with the filing of his opening brief on direct appeal, Bryan filed an application for an evidentiary hearing, supported by affidavits, seeking a hearing on the issue of trial counsel's ineffectiveness for "failure to utilize available evidence of [Bryan's] mental illness at any point in the trial." The OCCA did not specifically reject Bryan's request for an evidentiary hearing; it did so implicitly, however, when it proceeded to the merits of Bryan's ineffective assistance claims without an evidentiary hearing and denied him relief. *See Bryan I*, 935 P.2d at 263.

---

[4]On direct appeal to the OCCA, Bryan was represented by William Luker of the OIDS.

-10-

In the instant § 2254 habeas corpus petition, Bryan asserted the same claims of ineffective assistance he asserted in state court. The federal district court granted Bryan an evidentiary hearing, made findings of fact and conclusions of law, and denied relief. Although the respondent contended before the district court that an evidentiary hearing was unnecessary because "there is plenty of information in the record before this Court to make that determination," he did not raise the propriety of that hearing before this court. Accordingly, the panel declined to address the question whether the district court should have granted Bryan an evidentiary hearing on his claims of ineffective assistance. *See Bryan III*, 276 F.3d at 1172 n.6 (citing *Romano v. Gibson*, 239 F.3d 1156, 1174 n.9 (10th Cir. 2001) (declining to consider propriety of district court's grant of an evidentiary hearing when such hearing had already taken place and respondent had not challenged on appeal district court's decision to grant hearing)).

In the order granting rehearing *en banc*, this court instructed the parties to address the following questions:

> Did the district court's decision to take evidence on Mr. Bryan's claim that his counsel was ineffective in failing to present mental health evidence at trial comport with 28 U.S.C. § 2254(e)(2)? By failing to argue the issue on appeal, did the government waive its objection to the district court's grant of an evidentiary hearing?

In his supplemental brief, the respondent cites *Romano* and asserts that the issue is not "properly before this court for review at this time" because he did not

-11-

appeal the district court's grant of an evidentiary hearing. The respondent nevertheless proceeds to brief the issue on the merits and again asserts that an evidentiary hearing was unnecessary because "there [was] plenty of information in the [existing state court] record" to decide the merits of Bryan's claims of ineffective assistance. We conclude that the district court's decision to grant Bryan an evidentiary hearing on his claims of ineffective assistance did not contravene 28 U.S.C. § 2254(e)(2). Accordingly, it is unnecessary to determine what steps a respondent must undertake to preserve an objection, predicated on § 2254(e)(2), to a district court decision to grant a habeas petitioner an evidentiary hearing.

Section 2254(e)(2) provides that "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant" satisfies one of the two exceptions set out in § 2254(e)(2)(A) or (B). If, however, the petitioner did not "fail[] to develop the factual basis of [his] claim in State court," *id.*, § 2254(e)(2) is not applicable and a federal habeas court should proceed to analyze whether a hearing is appropriate or required under pre-AEDPA standards. *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998). Under those standards, Bryan is entitled to an evidentiary hearing "so long as his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief."

*Id. See generally Medina v. Barnes*, 71 F.3d 363, 369-71 (10th Cir. 1995) (discussing at length pre-AEDPA standard for obtaining an evidentiary hearing).

In his supplemental brief before the *en banc* court, the respondent does not dispute that Bryan diligently sought to develop the factual basis underlying his claims of ineffective assistance in state court.[5] Instead, he argues that the evidentiary hearing was inappropriate because Bryan's allegations "are contravened by the existing record." Respondent's Brief at 19. Notably, however, the respondent does not identify those portions of the state court record which allegedly contravene the allegations of ineffective assistance set out in Bryan's § 2254 habeas petition. Instead, he broadly asserts that the trial record contained sufficient information to allow the OCCA to decide the merits of Bryan's claims without an evidentiary hearing and that, in light of that record, the decision of the OCCA rejecting Bryan's claims of ineffective assistance is neither

---

[5]*See Williams v. Taylor*, 529 U.S. 420, 432 (2000) ("Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."); *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998) (noting that the petitioner had sought and been denied an evidentiary hearing in state court and concluding that where "a habeas petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so, § 2254(e)(2) does not apply").

contrary to nor an unreasonable interpretation of governing Supreme Court precedent.[6]

We find the respondent's argument, which is not supported by a single citation to the state court record, unconvincing. This court has reviewed the entire state court record, including the transcript of the retrospective competency hearing. Although that record contains much information relevant to the question whether Freeman's failure to utilize mental health evidence during both the guilt and penalty phases of Bryan's trial was constitutionally ineffective, it is missing key testimony from Freeman regarding what he knew and understood about Bryan's mental health history and, most importantly, why he decided not to utilize that evidence. It is exactly this information Bryan sought to develop in state court when he requested an evidentiary hearing before the OCCA. Because Bryan diligently sought to "develop the factual basis of [his] claim in State court proceedings," § 2254(e)(2) does not bar an evidentiary hearing.

Accordingly, the appropriate question is whether Bryan was entitled to a hearing under pre-AEDPA law. *See Miller*, 161 F.3d at 1253 (holding that pre-AEDPA standards govern question of propriety of granting an evidentiary

---

[6]*See* Respondent's Brief at 20 ("[B]ecause Petitioner did develop his ineffective assistance of trial counsel [claim] for not presenting the mental health evidence there was sufficient information in the record to determine if the state court decision was contrary to, or an unreasonable application of, clearly established law.").

hearing when a petitioner diligently sought to develop the factual basis of his claim in state court and citing *Medina*, 71 F.3d at 368-69, as setting out the controlling pre-AEDPA standard). The answer to that question is clearly "yes." *See Medina*, 71 F.3d at 369-70 (examining controlling Supreme Court cases and holding that those cases require "an evidentiary hearing when the facts were not adequately developed in the state court, so long as that failure is not attributable to the petitioner").

Having determined that the district court correctly afforded Bryan an evidentiary hearing on his claims of ineffective assistance, the appropriate standard of review is that set out in *Miller*.

> [I]neffective assistance claim[s] present[] a mixed question of law and fact. Because our analysis of this claim primarily involves consideration of legal principles, we review this claim de novo. Further, we note that because the state court did not hold any evidentiary hearing, we are in the same position to evaluate the factual record as it was. Accordingly, to the extent the state court's dismissal of [petitioner's ineffective assistance claim] was based on its own factual findings, we need not afford those findings any deference.

*Miller*, 161 F.3d at 1254 (citations omitted).[7]  *But see Valdez v. Cockrell*, 274

F.3d 941, 953 (5th Cir. 2001) (specifically rejecting *Miller* approach and holding

instead that even where a petitioner was denied a full and fair hearing, federal

court is obligated to apply the deferential review standards set out in § 2254(d)

and (e)).[8]  In these circumstances, this court accepts the district court's factual

findings unless they are clearly erroneous and reviews *de novo* whether counsel's

performance was legally deficient and whether the deficiencies prejudiced the

defendant.  *See United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995).

B.  *Discussion*

"A convicted defendant's [or habeas petitioner's] claim that counsel's

assistance was so defective as to require reversal of a conviction or death

sentence has two components."  *Strickland v. Washington*, 466 U.S. 668, 687

---

[7]In light of *Miller*, the panel erred in applying the deferential review standards set out in § 2254(d) and (e) in reviewing Bryan's claims that his trial counsel was ineffective.  *See Bryan III*, 276 F.3d at 1177 (concluding that OCCA's resolution of Bryan's claim of ineffective assistance during guilt phase was not contrary to or an unreasonable application of Supreme Court precedent pursuant to § 2254(d)(1)); *id.* (same as regards OCCA's resolution of Bryan's claim of ineffective assistance during penalty phase).

[8]In a published dissent from the denial of rehearing *en banc*, four judges of the Fifth Circuit registered their agreement with *Miller* and noted that the rule adopted by the Fifth Circuit mandated the perverse result of deferring to legal and factual determinations made by state courts, even though a habeas petitioner had never been afforded a full and fair opportunity to develop the factual basis of his claim in state court.  *See Valdez v. Cockrell*, 288 F.3d 702, 703-05 (5th Cir. 2002) (Dennis, J., dissenting from the denial of the Petition for Rehearing En Banc).

(1984); *see also id.* at 697 ("The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial."). To be entitled to relief, a petitioner must prove both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *See id.* at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."). To carry his burden of demonstrating that counsel's performance was deficient, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* To carry his burden of demonstrating prejudice, a petitioner must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

The Supreme Court has made clear that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in [any particular order] or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. As set out more fully below, this court resolves Bryan's claim of ineffective assistance on the basis of *Strickland*'s performance prong. For that reason, and because it is important to reemphasize

that "[j]udicial scrutiny of counsel's performance must be highly deferential," we set out the Supreme Court's teachings on the matter at some length. *Id.* at 689.

The proper measure of attorney performance is that of reasonably effective assistance under prevailing professional norms, considering all of the surrounding circumstances. *Id.* at 687-88. The Court has been crystal clear that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. " *Id.* at 689. For that reason, a reviewing court must "reconstruct the circumstances of counsel's challenged conduct [and] evaluate [that] conduct from counsel's perspective at the time." *Id.*; *see also id.* at 690 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). Because of the difficulties that inhere in such a process, "a court must indulge a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689 (emphasis added). The importance of this presumption cannot be overstated. This is made clear by the Court's repeated invocation of the "strong presumption" that counsel provided constitutionally adequate

assistance. *See id.* at 690 ("[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."); *id.* at 696 ("In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.").

Thus, this court must analyze whether Bryan has adduced sufficient evidence to overcome the strong presumption that trial counsel provided constitutionally adequate assistance during both the guilt and penalty phase of Bryan's capital trial. In so doing, we recognize the "need to apply even closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case." *Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001) (quotations omitted).

### 1. *Failure to present mental health evidence during the guilt phase*

In his brief before the panel,[9] Bryan contended that Freeman should have presented evidence of his mental illness during the trial's guilt stage in support of either an insanity defense or in support of a second-degree murder instruction. In

---

[9]As noted above, Bryan's counsel ignored this court's request that he address in his supplemental *en banc* brief the question of the effectiveness of trial counsel's performance during the guilt phase. *See supra* n.2.

particular, Bryan relies on a report prepared by Dr. Murphy for the defense in May of 1994 which indicates that "Mr. Bryan suffers from a serious mental disorder which places into serious question . . . his legal culpability in the crimes for which he is charged." Bryan asserts that this evidence, when coupled with the interview performed by Dr. Smith, evidence derived from CAT and SPECT scans of Bryan's brain, and the Eastern State Hospital records, casts doubt on his ability to form an intent to kill.

Bryan's arguments regarding the viability of a guilt-phase insanity defense are completely at odds with the testimony adduced at the evidentiary hearing conducted by the district court. To assert an insanity defense, "Oklahoma . . . requir[es] the defendant to show that at the time of the crime he suffered from a mental disease or defect rendering him unable to differentiate between right and wrong, or unable to understand the nature and consequences of his actions." *James v. Gibson*, 211 F.3d 543, 553 (10th Cir. 2000) (quotation omitted). Despite the statements in Dr. Murphy's May 1994 report relied upon so heavily by Bryan, Freeman testified unequivocally that both Drs. Murphy and Smith told him that Bryan was not legally insane and that he relied on the doctors' opinions in formulating his trial strategy.[10] Freeman's testimony in this regard was fully

---

[10]Freeman testified as follows:
      Counsel: Do you recall at that County Line meeting what Dr.
                                          (continued...)

corroborated by testimony provided by Hess at the federal evidentiary hearing.

Hess specifically testified there was no medical evidence indicating that Bryan did not understand the consequences of his actions and no medical evidence that would provide a defense during the guilt phase of the trial. Instead of presenting a viable defense based on medical evidence during the guilt phase of the trial, Hess' strategy was to utilize the guilt phase to lay the foundation for a mitigation

---

[10](...continued)
Smith's opinion was as to the petitioner's sanity?

. . . .

Freeman: Yes, sir, I do, because that was one of the things that I wanted to learn was where we stood on the matter of insanity question. And Dr. Smith's response was, in being asked a question as to whether or not Mr. Bryan was legally insane, that he was not. I believe what he said was, if I refresh my recollection, that he might be crazy but he was not legally insane.

. . . .

Counsel: Mr. Freeman, we were discussing your meeting with certain members of the defense team at the County Line Restaurant. Now, let me ask you: Do you recall that Dr. Smith provided you an opinion as to whether the petitioner could or could not form the intent to kill?

Freeman: No, sir, I do not remember. I do not recollect him giving me any such opinion.

Counsel: You do recall or do you recall, though, that he gave you an opinion as to legal sanity?

Freeman: Yes.

Counsel: And did Dr. Murphy give you an opinion, likewise?

Freeman: Yes, he did.

Counsel: And was it the same as Dr. Smith's, essentially?

Freeman: Yes, sir.

Counsel: And did you rely on the opinion of these experts?

Freeman: Yes, sir.

case at the penalty phase.[11]  Accordingly, Freeman lacked the medical evidence

necessary to present an insanity defense at the guilt stage of Bryan's trial.[12]

_____

[11]Hess testified as follows:

Counsel: After you had talked with some various experts and talked with Mr. Bryan and conducted your investigation, did you arrive at a strategy for how to defend the case?

Hess: Yes, I did.

Counsel: And what was that strategy, please?

Hess: We filed a notice of intent to rely on the insanity defense, the reason being the version of the case that was provided with—by Mr. Bryan varied very little over the two months that I spent talking to him.  It was the same story every time we talked.

That factual basis provided by Mr. Bryan did not meet what the factual basis was as the evidence in this case showed, and our belief was to put Mr. Bryan—try the case, put Mr. Bryan on the stand in Stage 1, let him tell the jury his story, and then follow that up with either Dr. Smith or Dr. Murphy, to start laying the groundwork for where all my evidence was invariably going to go, which was a Stage 2 mental health defense in mitigation to—in an attempt to save Mr. Bryan from the death sentence.

[12]Nor would the medical evidence Freeman possessed have supported an instruction for second degree murder.  Under Oklahoma law, second degree murder "occurs '[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.'" *Gilson v. State*, 8 P.3d 883, 917 (Okla. Crim. App. 2000) (quoting Okla. Stat. Ann. tit. 21, § 701.8(1)).  The facts in this case do not suggest the lack of a premeditated intent to kill the victim.  Rather, Inabel was abducted from her home and shot, having had a pillowcase taped over her head.  Further, as the testimony of Hess and Freeman set out above demonstrate, there was simply no evidence available at trial specifically indicating Bryan was not capable of forming the requisite intent for first degree malice murder.

Significantly, Bryan did not want his attorney to present evidence suggesting he was mentally ill[13]; he was also apparently unwilling to accept a guilty plea to avoid a possible death sentence.[14] This court must presume that Bryan was competent to rationally assist defense counsel at trial, as he was adjudicated competent at the retrospective competency hearing. *See Bryan III*, 276 F.3d at 1169-72. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed

---

[13]Bryan testified at the federal evidentiary hearing as follows:

Counsel: Mr. Bryan, is it fair to say that neither you nor your parents wanted Mr. Freeman or any earlier lawyer, for that matter, to use any evidence of your alleged mental evidence in court?
Bryan: That's correct.
Counsel: Was that clearly communicated to Mr. Freeman?
Bryan: It was.

[14]With regard to the possibility of a plea agreement, Gibson, Bryan's first OIDS attorney, testified as follows during Bryan's retrospective competency hearing:

Gibson: There were considerable plea negotiations in the case. There were plea offers of plea—again, my discussions and advice to Mr. Bryan was on numerous occasions that he accept those offers.
. . . .
Counsel: Well, Mr. Gibson, since its been opened up, what was the only offer ever made to you for a recommendation in regard to this man?
Gibson: I don't want to misspeak, [Counsel]. There were discussions and I'm not absolutely sure whether a firm offer was made or what some DA's would consider an offer, but I—it was my understanding and what I communicated to Mr. Bryan was that the State would accept a plea, even a plea of nolo contendere to a life without parole sentence.

strategic choices made by the defendant and on information supplied by the

defendant." *Strickland*, 466 U.S. at 691; *see also Romano*, 239 F.3d at 1181

(collecting cases for this proposition). "Although trial counsel has an

independent duty to investigate and make a case in [defense], counsel also has to

be responsive to the wishes of his client." *Romano*, 239 F.3d at 1181; *see also*

*Wallace v. Ward*, 191 F.3d 1235, 1247-48 (10th Cir. 1999) (concluding counsel's

decision to acquiesce to petitioner's wishes that attorney not present any

mitigating evidence during penalty phase was not deficient performance).

Additionally, the prosecution's case, although strong, was almost entirely

circumstantial. *See Smith v. Gibson*, 197 F.3d 454, 461-62 (10th Cir. 1999)

(holding defense counsel's innocence-based defense was reasonable strategy in

light of circumstantial nature of prosecution's case). There was evidence

admitted at trial indicating that Bryan's physical condition had so deteriorated at

the time of the murder, due to his diabetes, that he was physically incapable of

carrying out this crime.

Accordingly, based on the record before this court, it appears that Freeman

had two options during the guilt phase of the trial. He could put the prosecution

to its burden of proof, as he was specifically instructed to do by Bryan. Or,

alternatively, he could present a non-viable insanity defense, as foundation for a

mitigation case during the penalty phase, the very strategy that led to Bryan's

termination of Munkres[15] and Hess.  Freeman's decision to follow the former course—after meeting with the medical experts, reviewing all of the additional medical evidence, consulting with Bryan on numerous occasions, and noting the circumstantial nature of the prosecution's case and the evidence of Bryan's deteriorated health—is not objectively unreasonable.  *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

2.  *Failure to present mental health evidence during the penalty phase*

In his supplemental brief before the *en banc* court, Bryan argues that Freeman provided objectively unreasonable representation during the penalty phase of the trial through ignorance of the law and failure to act as a knowledgeable guide and advisor.  In particular, Bryan asserts that Freeman did not understand the importance of thoroughly investigating and presenting mitigating evidence as demonstrated by his view that evidence of mental illness short of insanity was not relevant during the penalty phase.  He further asserts that in light of this failure, Freeman "failed adequately to advise Mr. Bryan regarding the mitigating evidence which was available and its potential benefits."

---

[15]As noted above, Bryan replaced Munkres four days after Bryan's first competency trial because of "philosophical differences in how this case should proceed in my best and most aggressive defense to the charges leveled against me."  *See supra* Section II.B., at 7.

This court finds Bryan's arguments unconvincing on several levels. First, Freeman's testimony at the federal evidentiary hearing relied upon by Bryan in support of his claim that Freeman did not understand the relevance of Bryan's mental health evidence is presented out of context and is clearly insufficient to overcome the strong presumption that Freeman "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Second, Hess clearly testified that he discussed with Bryan his preferred strategy of utilizing mental health evidence during both the guilt and penalty phases of Bryan's trial, with a focus on the penalty phase and preventing a sentence of death, and that Bryan had vigorously rejected the use of mental health evidence and terminated him. Accordingly, Bryan was certainly apprised of the benefits of using mental health evidence in mitigation at the penalty phase and rejected that strategy. Freeman was well aware of this history, having spent an extensive amount of time with Bryan[16] and having met with Hess to discuss the case and the available mental health evidence. Finally, the only testimony adduced at the federal evidentiary hearing on the question demonstrates that the use of mental health evidence during the penalty phase would not have been effective following a guilt phase defense of

---

[16]Freeman testified at Bryan's retrospective competency hearing that he spent between 1200 and 1500 hours working on Bryan's case and that "the bulk of that would have been with Mr. Bryan."

-26-

actual innocence. *See infra* n.22. Accordingly, Freeman's decision not to employ medical evidence, viewed from "his perspective at the time" of the trial, is not objectively unreasonable. *Strickland*, 466 U.S. at 689.

Relying on limited portions of Freeman's testimony at the evidentiary hearing held by the district court, Bryan argues that Freeman did not understand the potential usefulness of mental health evidence during the penalty phase, instead thinking that such evidence was irrelevant unless it demonstrated insanity or lack of competence. A review of Freeman's statements in context, however, confirms the district court's conclusion that "[t]rial counsel's decision not to present evidence of Petitioner's organic brain syndrome and mental illness [at the penalty phase] was clearly a strategic one."[17]

For instance, Bryan notes at the evidentiary hearing, Freeman responded affirmatively to the following cross-examination question: "So you saw no use for the experts' mental testimony, except to prove either insanity or incompetence, right?" When read in context, however, it is clear that Freeman is

---

[17]*Cf. Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998) ("Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component. The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact . . . . By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact . . . .").

referring only to the guilt stage of the trial.[18]  Furthermore, Bryan simply

misreads the transcript in asserting Freeman testified that he thought the

testimony of the medical experts "would not have been relevant at all."  Instead,

when read in context, Freeman was indicating that it was the opinion of Bryan's

*parents* that was irrelevant to his determination not to mount an insanity defense

[18]Freeman testified during cross-examination as follows:

Counsel: Now, Leroy . . . could have had public defenders put on the organic brain damage evidence and the mental health evidence at no cost to Leroy or to the family, right?

Freeman: That's right.

. . . .

Counsel: And your strategy was to try to create a reasonable doubt by basically attacking the testimony and the credibility of the State's witnesses?

Freeman: Yes, sir.

. . . .

Counsel: And you resolved to create that reasonable doubt without using any of the mental health experts?

Freeman: Yes, sir.

. . . .

Counsel: Okay.  And you allowed the mental health witnesses to stay on the witness list that you finally went to trial with, right?

Freeman: Yes, sir.

Counsel: And you did that in the hopes that maybe they would come up with something where they could say Leroy was insane or he was incompetent, right?

Freeman: That was a part of it.  The other part was that I didn't want to cut my options and I didn't want the district attorney to know that I might not raise that defense, because I wanted them to be concerned about other things that I could create for them to be concerned with.

Counsel: So you saw no use for the experts' mental testimony, except to prove either insanity or incompetence, right?

Freeman: That's right.

-28-

during the guilt phase of the trial, *not the opinions of the medical experts*.[19]  Nor

can it be asserted that Freeman thought that he was ethically prohibited from

presenting mental health evidence during the *penalty phase* of the trial.  Instead,

taken in context, Freeman's testimony reflects the fact that he had no medical

evidence supporting a guilt-phase insanity defense and that he was fearful that

any testimony by Dr. Murphy during the second stage would do more harm than

good.[20]

---

[19]Freeman testified on cross-examination as follows:

Counsel: Now, you [indicated] on direct . . . that it was in the final preparation for the trial that Leroy's parents first told you they didn't think he was insane?

Freeman: It was at some time during the preparation, closer to trial time than closer to the time I was hired. . . .

Counsel: Would I be correct in saying that Leroy's parents vociferously and adamantly denied there was anything wrong with Leroy?

Freeman: Yes, they did.  You'd be correct in saying that.

Counsel: And you were guided by that judgment rather than the judgment of the doctors, weren't you?

Freeman: No. No. No matter what, they stated—the doctors had said that Mr. Bryan was neither incompetent to stand trial or was not insane at the time and could form the intent and so forth. *What they said would not have been relevant at all*.

Counsel: Okay.  And if any mental health expert was not going to say that he was legally insane or he was legally incompetent, he wasn't going to be of any benefit to you, right?

Freeman: That was my feeling.

Counsel: All right.  There was no question in your mind, though, that Leroy's parents thought he was not mentally ill?

The Court: He's made that clear.

[20]Freeman testified as follows in this regard:

(continued...)

[20](...continued)

Counsel: Now, what arrangements did you make with Dr. Murphy regarding his testimony in the second stage of the trial?

Freeman: I arranged with him to come to Elk City the evening before we anticipated calling him if we were going to call him. . . . And then that evening, though, after having evaluated the evidence that was presented by the State in the second stage, and as I recollect we had put on some of our evidence, I determined that in putting him on with the conclusion that he was going to give the State, that although he would say that there were brain abnormalities in Mr. Bryan's brain, that his bottom line, his conclusions were that he had the ability to form intent, that he knew what he was doing and he knew the consequences of his acts.

And I was fearful that if I did that, that would just more nearly accentuate the position of the State, that he was prone to be and could be a danger to society and would probably hurt my case more than it would help it. So I elected not to call him and I called him that evening and told him that he could go back home.

. . . .

Counsel: In your own words, please explain your second-stage trial strategy in this case.

Freeman: We had taken the position throughout the trial, by reason of the fact that I could not demonstrate by medical testimony or evidence that Mr. Bryan was insane, he had already been determined competent on, I believe, either two or three occasions, . . . that if I raised that as a defense and put on that evidence . . . I started a process and *I couldn't get to where I wanted to go ethically and honestly because they were not going to say that he was insane*.

If I tried to do that, then I compromised Mr. Bryan's position in the trial of the case and elected to make the State prove and try—beyond a reasonable doubt and try to create a sufficient doubt that the jury would believe that he had not committed the offense with which he was charged.

*In the second stage*, then, as I said, Dr. Smith was out. He hadn't been considered for some time because of what he said. I had visited on either two or three occasions with Dr. Murphy, and he had told me, you know, that he found brain abnormalities, but that the

(continued...)

Accordingly, when viewed as a whole, the testimony at the evidentiary hearing simply does not support Bryan's assertion that Freeman suffered under a misapprehension as to the propriety of adducing mental health evidence short of an insanity diagnosis during the penalty phase of the trial. Instead, the testimony set out above demonstrates a concern with two considerations. First, Freeman was concerned that testimony by either Dr. Smith or Dr. Murphy might play into the prosecution's case that Bryan was a continuing threat to society. *See Cannon v. Gibson*, 259 F.3d 1253, 1277-28 (10th Cir. 2001) (noting that mental health evidence like that at issue here has the possibility of being a "two-edged sword").[21] Second, Freeman was concerned that an about-face during the penalty

---

[20](...continued)
bottom line was that he could form the intent, that he knew the difference in right and wrong, and that he knew the consequences of his acts.

And as I say, *in the second stage*, I felt that I would compromise myself if I tried to get into that or compromise Mr. Bryan and myself and I was fearful that his testimony would simply support the theory and the evidence of the State.

[21]Hess admitted the truth of this proposition under cross-examination at the evidentiary hearing:

Counsel: Regarding mitigation evidence, and particularly evidence of a psychological problem with the defendant, would you agree that that sometimes can be a double-edged sword in a capital case?

Hess: Very much so.

Counsel: And that often a jury might accept evidence of psychological or emotional problems as evidence of aggravation?

Hess: Yes, sir. I've had that happen in several cases.

-31-

phase might compromise Bryan in the eyes of the jurors.[22]  Bryan has simply not

pointed to any evidence in the record sufficient to overcome the "strong

presumption" that Freeman's decision not to present mental health evidence

during the penalty phase of the trial was a strategic decision.  *Strickland*, 466

U.S. at 689.[23]

Having determined that Freeman's decision not to present mental health

evidence during the penalty phase was strategic, this court moves on to the

question whether that strategic decision was reasonable when viewed from

Freeman's perspective at the time of the trial.  *See id.* at 690.  Perhaps most

importantly, Bryan did not want Freeman to present any psychiatric evidence,

---

[22]Bryan's legal expert witness, Tim Wilson, testified during the evidentiary hearing that this was an important consideration:

> Counsel: You mentioned that sometimes the second stage investigation ends up being used in the first stage.  Why does that happen?
> Wilson: Well, the kiss of death in death penalty litigation would be to have an inconsistent defense to—pardon the expression "kiss of death," but to run a denial—typically a denial defense in first stage and then in second stage suddenly turn around and introduce remorse and things like that are inconsistent and simply don't work.  And the theory is that both stages must dovetail together.  You should try to front-load as much of your mitigation as possible in an effort to save your client's life.

[23]*See also Bullock v. Carver*, 297 F.3d 1036, 1047, 1051 (10th Cir. 2002) (noting that although the ultimate question is always whether counsel's performance fell below an objective standard of reasonableness, "where it is shown that a challenged action was, in fact, an adequately informed strategic choice, we heighten our presumption of objective reasonableness and presume that the attorney's decision is nearly unchallengeable").

was adamant about pursuing an innocence defense during the guilt phase of his trial, and had apparently refused to even consider a guilty plea in exchange for a life sentence. *See*, *e.g.*, *Romano*, 239 F.3d at 1181; *Smith v. Massey*, 235 F.3d 1259, 1278 (10th Cir. 2000); *Wallace*, 191 F.3d at 1247-48. This court must presume that Bryan was competent to make that determination. *See Bryan III*, 276 F.3d at 1169-72. Furthermore, the record reveals that Hess specifically discussed with Bryan his proposed strategy of utilizing mental health evidence during the first stage of the trial as a foundation for a strong mitigation case during the penalty phase of the trial, asserting that this was the only viable strategy to save Bryan's life.[24] In response, Bryan terminated Hess and hired Freeman. Freeman, well aware of this history after having met with Hess to discuss the case, and well aware that no medical expert would support a guilt-phase insanity defense, complied with Bryan's informed strategic choice and put the government to its proof at trial.

It is worth emphasizing again what was stated above: "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. Although this strategy limited Bryan's options during the penalty phase, it

---

[24]As noted above, Bryan's legal expert, Wilson, concurred with Hess' assessment that to be effective mitigation evidence, the mental health evidence had to be incorporated into the guilt phase of the trial. *See supra* n.22.

-33-

was not objectively unreasonable for Freeman to utilize an innocence defense during the guilt phase for those reasons set out above.  Furthermore, in light of the testimony of Hess, Wilson, and Freeman regarding the need for consistency between guilt and penalty phase presentations, and the possibility that Dr. Murphy's testimony during the second stage could have supported the prosecution's argument that Bryan constituted a continuing threat to society, it was not unreasonable for Freeman to utilize a mercy approach during the penalty phase.[25]  Bryan has simply not overcome the strong presumption set out in

---

[25]The dissent relies on the Supreme Court's recent decision in *Wiggins v. Smith*, 123 S. Ct. 2527 (2003), to support its assertion that Freeman's performance during the penalty phase was ineffective because Freeman did not present evidence of Bryan's mental illness.  In *Wiggins*, however, the basis of the petitioner's claim was that his counsel's failure to present potential mitigation evidence flowed from the failure to conduct an adequate investigation.  *See id.* at 2535 ("In this case, as in *Strickland*, petitioner's claim stems from counsel's decision to limit the scope of their investigation into potential mitigation evidence.").  The Court began its analysis of petitioner's claim by noting as follows: "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and stratgic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 2535 (quotation omitted).  Because petitioner's counsel had conducted a plainly inadequate investigation, and because copious and powerful mitigating evidence would have been discovered if an adequate investigation would have been conducted, the court concluded that counsel's failure to present mitigation evidence during the penalty phase was not insulated from review as a strategic decision and was, in fact, unreasonable. *Id.* at 2541-42.

As set out at length above, there is no question that Freeman was fully aware of Bryan's history of mental illness.  Well aware of that history, and its failure to provide a defense at the guilt stage of the trial, Freeman complied with

(continued...)

-34-

*Strickland* that Freeman provided objectively reasonable assistance during the penalty phase of the trial.[26]

## IV. CONCLUSION

This court cannot say, under the facts set out above, that Freeman's strategic choice not to present mental health evidence during Bryan's trial was objectively unreasonable. "There are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689; *see also Nix v. Whiteside*, 475 U.S. 157, 165 (1986). We are mindful that it is "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466

---

[25](...continued)
his competent client's wishes to put the government to its burden of proof at the guilt stage of the trial. Aware of the serious problems associated with presenting inconsistent theories during the guilt and penalty phases, concerned that Dr. Murphy's testimony might do more harm than good during the penalty phase, and conscious of his client's consistently expressed refusal to rely on mental health evidence, Freeman made a strategic choice to seek mercy during the penalty phase. This strategic choice is "virtually unchallengeable." *Id.* at 2535. *Wiggins* simply does not speak at all to the circumstances of this case.

[26]Bryan seems to assert that, even independent of the question of the use of medical evidence during the penalty phase, Freeman's presentation was deficient. He does not, however, present a *Strickland* analysis of anything other than the failure to utilize the medical evidence. Accordingly, this court does not consider the matter further. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) (holding that "[a]rguments inadequately briefed in the opening brief are waived").

U.S. at 689. Thus, "in considering claims of ineffective assistance of counsel, we address not what is prudent or [even] appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quotation omitted). In this case, Bryan has failed to establish that "in light of all the circumstances, [counsel's] identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

**HENRY, J., concurring in part and dissenting in part; Judges SEYMOUR, EBEL,** and **LUCERO,** join:

**RE:** <u>00-6090, Bryan v. Mullin</u>

Robert Leroy Bryan is a delusional, severely diabetic victim of organic brain damage. He had been charged with solicitation of murder several years previous to this crime, but was found incompetent and subsequently institutionalized. Unfortunately for many, after intensive treatment, he was released. Amazingly, he was not monitored. Mr. Bryan's illness manifested itself again in his deluded and tragic actions that led to the case at hand. Mr. Bryan repeated the most significant portions of his earlier attempted crime, using the same location to conceal the body that he had revealed to the police in the solicitation crime and the same tactic of seeking to use unsigned and forged checks to repay his "business losses." He "repeated" his previous crime, but this time, he killed his Aunt Inabel, whom he believed (and this is not contested) owed him several million dollars from cheating him out of fictional monies owed for fictional inventions.

Despite the compelling evidence in the record regarding Mr. Bryan's history of mental illness, and despite the fact that the sentencing jury never heard that evidence, the majority concludes that Mr. Bryan did not receive ineffective assistance of counsel at sentencing. The majority concludes that Mr. Freeman was fully aware of the potential use of mental health testimony at sentencing, but

that his client forbade the use of this compelling testimony in the sentencing phase. The majority also notes that counsel feared adopting an approach in the sentencing phase that might appear inconsistent with the guilt phase strategy. And, the majority concludes that counsel was concerned that the mental health testimony might be viewed to support future dangerousness.

This reasoning is untenable. Mr. Bryan's counsel provided the most ineffective defense I have ever seen, amounting to a concession of guilt and relating none of the reams of compelling mitigating evidence. First, the record shows that Mr. Bryan's counsel clearly did not even understand that the mental health evidence might have been used in an attempt to reduce Mr. Bryan's culpability at sentencing. Next, case law and common sense make clear that counsel's reliance on directions from a deeply disturbed client such as Mr. Bryan cannot insulate him from his duty to present mitigating evidence. Third, counsel did not inform his client about the purpose of the sentencing stage and what role the mental health history might have played, thus, further negating any reliance on Mr. Bryan's wishes. Finally, counsel's performance at Mr. Bryan's sentencing cannot be insulated by conferring upon it an *ex post* strategy that did not exist. Similarly, we cannot insulate an unreasonable tactic not to present mitigating evidence by labeling it a two-edged sword. Mr. Bryan's lawyer was clearly ineffective as a matter of law.

# I. BACKGROUND

Mr. Bryan had three defense attorneys (two of them court-appointed) before his parents, seeking to help him, fired his public defender and mortgaged their home to hire Mr. Freeman. Mr. Freeman, in what was his third capital case, charged the elderly Bryans the sum of $50,000 for his services. Had the Bryans not tried to help, paradoxically, I believe that Leroy Bryan would not be facing execution today.

Mr. Bryan sincerely relayed the same intricate plots and stories to all four of his attorneys, explaining the circumstances regarding the murder in elaborate and unwavering detail, which apparently had no factual basis at all. All four attorneys agreed, however, that Mr. Bryan adamantly and genuinely believed this story to be true. In addition, each attorney explained the difficulties he had in attempting to communicate with Mr. Bryan, and explained that no facet of Mr. Bryan's outrageous stories could be confirmed. At times he appeared delusional, would ramble, appeared agitated, and would exhibit apparent paranoia through bizarre discourses concerning attorneys, bankers, jailers, and even a judge, all of whom, Mr. Bryan believe, were out to get him. *See e.g.* Retro. Comp. Hr'g, vol. II, at 285, 301 (Mr. Bryan exhibited "what to me was paranoid delusional talk, and then that coupled with the fact that the information was all unverifiable or incorrect." "He simply was not able to separate reality from fiction.") (testim. of

Wesley Gibson, former counsel); *id.* vol. I, at 229 ("[A]s for a rational communication effectively assisting me, I didn't see it.") (testim. of Steven B. Hess, previous counsel).

All the three previous counsel also indicated that they did not believe Mr. Bryan was able to assist in his defense. Two medical experts, well-versed in Mr. Bryan's medical history and also familiar with his delusions and history of mental illness, also testified that Mr. Bryan was unable to assist in his defense, because he suffered from an irreversible brain pathology, chronic paranoid schizophrenia. There was evidence also of organic delusional disorder, evidenced by a brain SPECT scan.[1]

Only one "expert" examined Mr. Bryan for the State. The expert's cursory one-hour evaluation, which preceded the trial by more than one year, produced no evidence of a mental illness at the time of the exam. The expert testified that he did not review the complete discharge summary from Mr. Bryan's earlier commitment to Eastern State Hospital, which revealed that Mr. Bryan suffered from organic delusional disorder. This expert, who was conducting his third or perhaps his fourth such evaluation at the time, acknowledged that Mr. Bryan's delusional disorder might be so well integrated that he would not have been able to discern it during his evaluation. This expert never spoke with Mr. Bryan on

---

[1] The SPECT scan, like all the evidence proving organic brain damage, was never presented to the jury.

any topic relating to his delusions, which were only apparent when the conversation turned to a topic related to his paranoia, or his fictional schemes. This expert was, incredibly, unfamiliar with Navane, the anti-psychotic agent and "most important drug" that Mr. Bryan was prescribed while at Eastern State. *See* Retro. Comp. Hr'g, vol. I., at 138 (testim. of Dr. Philip J. Murphy). Thus, he was familiar with neither Mr. Bryan's record of treatment nor his treatment.

Although the State initially offered to sentence him to life without parole, as the majority points out, Mr. Bryan stands today on the brink of execution, because his final lawyer's "strategy" was to hide from the jury any suggestion of the above evidence at either the guilt or the sentencing phases. Influenced perhaps by Mr. Freeman's underwriters–Mr. Bryan's parents–and also by Mr. Bryan's insistence upon his mental clarity, Mr. Freeman, who admits that he did little preparation for the crucial sentencing phase, supposedly adopted a "residual doubt" strategy, after that terminological haven was offered to him by the State during postconviction proceedings. His "residual doubt" strategy entailed admitting in his closing argument that Bryan had "killed" his aunt, and that this act was "vile."

Despite counsel's purported familiarity with the above history, and his admission that the stories relayed in all sincerity by Mr. Bryan were unrealistic and "crazy," and despite the remaining reams of documentation supporting Mr.

Bryan's organic brain disorder, Mr. Freeman apparently thought the better tack was to pretend Mr. Bryan was a perfectly normal defendant who was in a bad spot. Thus, Mr. Freeman presented *none* of the information discussed above to the jury.

So, found guilty and given no coherent defense in the sentencing phase, Mr. Bryan is sentenced to die. His competency called into question again, a constitutionally "disfavored" new competency hearing was ordered, where the jury was fully informed of the nature of his crime, the persons affected thereby, his conviction, and his sentence–essentially suggesting that he might be released if not found competent. Not surprisingly, the jury found Mr. Bryan, clad throughout the proceedings in his prison issue orange jumpsuit, competent.[2]

---

[2] Curiously, we have infrequently deemed it necessary to assess the propriety of such questionable hearings. The record reveals that the prospective jurors were told about the crime, and about Mr. Bryan's conviction and that they were simply revisiting Mr. Bryan's competency at the time of the crime.

I regret that out of the pool of twelve prospective jurors, several knew Mr. Bryan personally, having lived close by. One attended church with Mr. Bryan, and knew him through church events. Another was a former student from Mr. Bryan's science class. At least two had read about the crime, had followed the trial in the newspapers, and had formed opinions about Mr. Bryan's guilt. Retro. Comp. Hr'g, vol. I, at 20 ("Yeah. I believe he done it."). The final six chosen to serve included Mr. Bryan's former student, and the juror who testified that she believed Mr Bryan had committed the crime. Mr Bryan was also easily identifiable by witnesses and jurors alike, because he wore the orange jumpsuit of a convicted inmate.

Although the makeup of the jury has not been contested and is not contested by Mr. Bryan, I am even more inclined to disfavor reliance on such retrospective hearings when the jurors are informed of the conviction and his

(continued...)

-6-

The Supreme Court recently reminded us that

"retribution and deterrence of capital crimes by prospective offenders [are] the social purposes served by the death penalty. Unless the imposition of the death penalty on a mentally retarded person "measurably contributes to one or both of these goals, it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment."

*Atkins v. Virginia*, 536 U.S. 304, 319 (2002) (quoting *Enmund v. Florida*, 458 U.S. 782, 798 (1982)).  As discussed in detail below, the imposition by the State of Oklahoma of the death penalty against Mr. Bryan contributes nothing to either of these two legitimate goals, and also is not constitutional.

---

[2](...continued)
status on death row facing execution before and while they pondered his competency, and while staring at his convict's orange jumpsuit.  I would hope that in holding a retrospective competency hearing, a judge, and the OCCA, would "foresee the possibility of a jury becoming so incensed or angered about the circumstances of a crime that the decision regarding [competence] is unduly influenced. The . . . hearing . . . would seek to forestall that possibility and assist" the court.  *Murphy v. State,* 54 P.3d 556, 569 n.24 (Okla. Crim. App. 2002) (outlining aspirations for "an Atkins hearing").  Similarly, the hearing should "not to be a mere rubber-stamping of the jury's factual determinations, but an independent review of the evidence of [competency] by an objective, neutral [jury], uninfluenced by the nature and circumstances of the crime, the persons affected thereby, or any outside influence." *Id.* at n.25.  Clearly, Mr. Bryan benefitted from no such insulation of the jury at his retrospective competency hearing.

## II. OVERVIEW

Before turning to the disagreements I have with the majority's approach, I must compliment the majority's studiously fair recitation of the case's background. And, I concur with the majority's conclusion in Part III.A that Mr. Bryan was entitled to an evidentiary hearing before the district court, and that pursuant to *Miller*, we review de novo whether counsel's performance was legally deficient and whether the deficiencies prejudiced the defendant.

As to the majority's conclusion that Mr. Freeman did not provide ineffective assistance of counsel at the guilt phase, as stated in my original panel dissent, I believe Mr. Freeman's performance was ineffective for failing to introduce evidence of Mr. Bryan's mental illness. However, as I did previously, I will focus on Mr. Bryan's strongest argument, that is, whether Mr. Freeman's performance at the sentencing stage was similarly ineffective.

As stated in my original panel dissent, even under AEDPA's rigid and deferential standard of review, I believe that the OCCA unreasonably applied federal law when it concluded that Mr. Freeman's performance was effective. *See Bryan v. Gibson*, 276 F.3d 1163, 1171-85 (10th Cir. 2001) (Henry, J., dissenting). However, given our *de novo* review of Mr. Freeman's performance, this conclusion is that much easier to reach. Mr Freeman's performance during the sentencing phase fell outside the range of professionally competent assistance

and constituted ineffective assistance of counsel for failure to present testimony regarding Mr. Bryan's history of mental illness.

## A. The Majority's Holdings Regarding Counsel's Performance at Sentencing

The majority summarizes Mr. Bryan's ineffective assistance claim at sentencing as twofold: first, that Mr. Freeman did not understand that he did not have to establish incompetence to present mental health evidence in mitigation; and second, that Mr. Freeman failed to advise and inform Mr. Bryan of the use and potential benefit of the mental health evidence. As to Mr. Freeman's ignorance, the majority responds that the evidentiary hearing testimony establishes that Mr. Freeman was well-versed in the use of mental health history at the sentencing phase. The majority also relies on Mr. Freeman's hesitance to use the information because it might provide support for the continuing threat to society aggravator. And, in response to the challenge to Mr. Freeman's failure to explain the import and significance of the sentencing phase to his client, the majority relies on Mr. Bryan's perceived instructions not to present an insanity defense and defends Mr. Freeman's strategy at sentencing.

## B. Summary of Why the Majority Opinion Fails

Upon a very close examination of these unique facts, the faulty premises of these arguments emerge. First, Mr. Freeman did not fully appreciate the nature of the testimony offered by the medical experts regarding his client's condition. The testimony presented at the evidentiary hearing clearly establishes that Mr. Freeman felt compelled to present mental health testimony only if it would be "useful," that is, to establish incompetence. He did not recognize that testimony of organic brain damage, delusions, and that his client was "crazy" would be valuable mitigation evidence.

Second, a client's wishes or direction as to the approach at sentencing is not unassailable and is by no means binding, even in a case where there is little or no indication of mental distress. Here, society's real interest is in securing a just result that accurately assesses the culpability of those it prosecutes. Additionally, there is evidence that Mr. Bryan's parents influenced the decision not to present any of this compelling evidence.

Third, Mr. Freeman did not adequately inform his client about the purpose of the sentencing phase or the nature of the evidence that might be presented. The majority errs by relying on Mr. Freeman's reliance on conversations his client may have had with *previous* counsel as to the purpose of, and strategy behind, the sentencing phase.

Fourth, the majority mischaracterizes Mr. Freeman's "strategic decision" to adopt a "residual doubt" strategy because of the "need for consistency" between the guilt and sentencing phases. Unquestionably, consistency between the phases is ideal, but Mr. Freeman's purported strategy did nothing to preserve such consistency – his sentencing strategy squarely contradicted his guilt phase approach. The majority implicitly admits as much recognizing that Mr. Freeman's residual doubt approach was at best weak, and by characterizing it as a "mercy" approach. The majority also credits Mr. Freeman's concerns about the mental health evidence serving to support the continuing threat aggravator, without consideration of the particular mitigating evidence present before us. As a whole, Mr. Freeman's sentencing stage performance was completely deficient–resulting in a residual doubt strategy that admitted the crime–and hence resulted in prejudice to his client.

## III. DISCUSSION

### A. Deficiency of Counsel's Performance

In reviewing Mr. Freeman's performance, we bear in mind that "'[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" *Mitchell v. Gibson,* 262 F.3d 1036, 1063 (10th Cir. 2001) (quoting *Kyles v. Whitley,* 514 U.S. 419, 422 (1995) (internal quotation

-11-

marks omitted)).  The Supreme Court has held that it is critical to the reliability of a capital sentencing proceeding that the jury render an individualized decision. *See Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (in upholding the Georgia capital sentencing scheme at issue, emphasizing that "[t]he new Georgia sentencing procedures . . . focus the jury's attention on the particularized nature of the crime *and the particularized characteristics of the individual defendant*") (emphasis added).  "The jury in this case was effectively walled off from key mitigating evidence that went to the particularized characteristics of the individual defendant." *Id.* at 206.  No judge or jury has ever weighed Mr. Bryan's "particularized characteristics" in deciding whether the death penalty would be a constitutionally appropriate punishment.

"The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001).  "[T]he sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)). Accordingly, "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime." *California v. Brown*, 479 U.S. 538, 545 (1987) (emphasis in original) (O'Connor, J.,

concurring); *see also Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000) (noting that mitigation evidence "affords an opportunity to humanize and explain– to individualize a defendant outside the constraints of the normal rules of evidence"). "Consideration of such evidence is a 'constitutionally indispensable part of the process of inflicting the penalty of death.'" *Brown*, 479 U.S. at 541 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality)).

Thus, a criminal defendant who is charged with a capital offense has the right to present virtually any evidence in mitigation at the penalty phase. *See Hitchcock v. Dugger*, 481 U.S. 393, 399 (1987). "We are therefore compelled to insure that the sentencing jury makes an individualized decision while equipped with the 'fullest information possible concerning the defendant's life and characteristics,' and must scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence." *Mayes,* 210 F.3d at 1288 (quoting *Lockett v. Ohio*, 438 U.S. 586, 603 (1978)). When examining counsel's investigation and presentation of mitigation evidence, "the right to present mitigating evidence to the jury is constitutionally protected," *Mayes*, 210 F.3d at 1288, and, as the majority points out, that there is a corresponding "need to apply even closer scrutiny when reviewing attorney performance during the sentencing phase of a capital case." *Battenfield v. Gibson*, 236 F.3d 1215, 1226

-13-

(10th Cir. 2001) (quoting *Cooks v. Ward*, 165 F.3d 1283, 1294 (10th Cir. 1998));

*see also Duckett v. Mullin*, 306 F.3d 982, 997 (10th Cir. 2002) (same) (quoting

*Battenfield*).

### a. Counsel's Ignorance of the Use of Mental Health Testimony at Sentencing

The majority asserts that Mr. Freeman appreciated the nature of the reports

and conclusions offered by two psychiatrists, Drs. John R. Smith and Philip J.

Murphy.  Dr. Smith made the following conclusions regarding Mr. Bryan's

mental state:

> [Mr. Bryan suffers from an] extensive paranoid delusional system,
> fragmentation of thought, circumstantial thinking, and . . . diabetes.
>
> [The] delusional system and circumstantiality of thought . . . affect his
> ability to assist his attorney in his own defense.
>
> . . . .
>
> While he has an understanding of the charges against him, as
> many schizophrenic people do, this is no way modifies their real belief
> in their delusional system and cannot be interpreted accurately by the
> court to mean that he is capable, as in a person without a serious mental
> disorder, of participating in their own defense.

Evid. Hr'g Ex. 1.

Dr. Murphy reported that "Mr. Bryan suffers from a serious mental

disorder which places into serious question his competence to stand trial, as well

as his legal culpability in the crimes for which he is charged."  Evid. Hr'g Tr. at

-14-

95. Finally, in language that Mr. Freeman should have clearly understood, both Drs. Smith and Murphy referred to Mr. Bryan as "crazy." Evid. Hr'g Tr. at 83; Retro. Comp. Hr'g, vol. I, at 135.

In addition, Dr. E. William Allen, testified about the results of Mr. Bryan's SPECT scan. The SPECT scan results independently verified the preliminary tests performed by Drs. Murphy and Smith. The SPECT scan enables one to detect areas of dead or severely damaged brain tissue. Dr. Allen concluded that Mr. Bryan suffered from multiple areas of brain damage that raised serious concerns. He also noted that the brain deterioration was irreversible. As to what the SPECT scan indicated and would have shown had it been presented, Dr. Murphy later testified that Mr. Bryan suffered from "organic delusional disorder," meaning, in Dr. Murphy's words, that Mr. Bryan is "crazy" and suffers from "paranoid," "grandiose," and "persecutory" thinking. Retro. Comp. Hr'g vol. I, at 135.

In response to such reports, Mr. Freeman stated that he understood both Drs. Smith and Murphy to have said that Mr. Bryan was crazy, but that he was not legally insane. Mr. Freeman feared that because Mr. Bryan had the ability to form intent, that any testimony regarding his mental distress would indicate that Mr. Bryan was a danger to society.

In response to the request to "please explain your second-stage trial strategy in this case," Mr. Freeman responded:

We had taken the position throughout the trial, by reason of the fact that I could not demonstrate by medical testimony or evidence that Mr. Bryan was insane, he had already been determined competent on, I believe, either two or three occasions, two juries in Beckham County and one other doctor, plus the doctor in Granite had determined that he was competent, that if I raised that as a defense and put on that evidence, No. 1, I started a process and I couldn't get to where I wanted to go ethically and honestly because they were not going to say he was insane.

If I tried to do that, then I compromised Mr. Bryan's position in the trial of the case and elected to make the State prove and try – beyond a reasonable doubt and try to create a sufficient doubt that the jury would believe that he had not committed the offense with which he was charged.

In the second stage, then, as I said, Dr. Smith was out. He hadn't been considered for some time because of what he said. I had visited on either two or three occasions with Dr. Murphy, and he had told me, you know, that he found brain abnormalities, but that the bottom line was that he could form the intent, that he knew the difference in right and wrong, and that he knew the consequences of his acts.

And as I say, in the second stage, I felt that I would compromise myself if I tried to get into that or compromise Mr Bryan and myself and I was fearful that his testimony would simply support the theory of the State.

Evid. Hr'g Tr. at 86-87. Besides underestimating Dr. Murphy's written report I quoted earlier, nowhere did Mr. Freeman apparently consider or recognize the preeminent purpose of sentencing–to create an individualized history of Mr. Bryan in hopes that the jury might base its sentencing decision on the fullest information available. Nowhere did Mr. Freeman recognize that Mr. Bryan's

-16-

organic delusional disorder might serve to humanize his client. Mr. Freeman determined that if the experts could not say Mr. Bryan was insane or incompetent at the trial stage, their testimony that he was delusional, "crazy," and had substantial dead brain tissue was therefore excluded because it was irrelevant.[3] Similarly, because no expert would say that Mr. Bryan was insane or incompetent, their testimony, he incredibly believed, was rendered useless for any portion of the trial.[4]

Additionally, and perhaps even more telling, Mr. Freeman never asked Dr. Allen about the importance of his findings. *See* Evid. Hr'g Tr. at 98. Mr.

---

[3] As to note 19 of the majority opinion, I think it is not completely clear whether Mr. Freeman had shifted gears and was commenting of the relevance of the parents' statements rather than those of the medical experts. In any event, under any reading of the evidentiary hearing testimony, Mr. Freeman's utter disregard of the nature of the medical experts' testimony is resoundingly clear.

[4] Despite this, Mr. Freeman testified to the following:

Q: Up to this point, it has not occurred to you, has it, that if Leroy were organically brain damaged and mentally ill he might not be executed?

Mr. Freeman: It occurs to me that if that were a current opinion based upon his current condition then your answer might be true.

Q: But if that were true at the time of trial, the jury might not have given him the death penalty, right?

Mr. Freeman: They might not have.

Evid. Hr'g Tr. at 110.

Freeman never appreciated the visual uses of the SPECT scan. At the evidentiary hearing, both former counsel Mr. Hess and defense expert and assistant public defender Tim Wilson underscored the importance of the SPECT scan. *See e.g.* Evid. Hr'g Tr. at 33 ("The major issue for mitigation would have been the SPECT scan.") (testim. of Steven B. Hess, previous counsel); *id.* at 58 ("[The SPECT scan] makes a great exhibit.") (testim. of Tim Wilson). And Mr. Freeman, whose understanding of the SPECT scan was limited, never intended to have Dr. Allen testify, which would have clearly and independently verified the clinical results found by the psychiatrists.

Mr. Bryan had no appreciation that psychiatric mitigating evidence not only can act in mitigation, it also could significantly blunt the force of the aggravating factors. "[T]here is a great difference between failing to present evidence sufficient to establish incompetency at trial and failing to pursue mental health mitigating evidence at all." *Hardwick v. Crosby,* 320 F.3d 1127, 1164 (11th Cir. 2003) (quoting *Blanco v. Singletary*, 943 F.2d 1477, 1503 (11th Cir. 1991)). The majority ignores the possibility that "[o]ne can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider." *Id.* I cannot agree that Mr. Freeman's approach to the sentencing phase, which amounted to a denial of

any of Mr. Bryan's serious and evident mental disorders, was justifiable or reasonable.

### b. Mr. Bryan's Wishes Regarding Mental Health Evidence

Mr. Freeman attempts to defend his blueprint for the sentencing phase by relying heavily upon his client's wishes that he not present evidence of mental health history. Despite the unrefuted evidence of Mr. Bryan's longstanding delusions, the majority's holding adopts Mr. Freeman's argument, which contradicts case law from this and other circuits.

### (i) Mr. Bryan's desires are not sacrosanct

"Most importantly," asserts the majority, "[Mr.] Bryan did not want [Mr.] Freeman to present any psychiatric evidence." Maj. Op. at 32. The majority thus supplies a shield for Mr. Freeman: his "competent" client told him not to present evidence of mental health. In light of Mr. Bryan's long history of mental illness, it is difficult to characterize his decision as an informed strategic choice.

"In every trial there is more at stake than just the interests of the accused." *Mayberry v. Pennsylvania*, 400 U.S. 455, 468 (1971) (Burger, C. J., concurring). "Mitigating evidence plays an overwhelmingly important role in the 'just imposition of the death penalty. . . . As a practical matter, the defendant probably has little or no chance of avoiding the death sentence unless the defense

counsel gives the jury something to counter both the horror of the crime and the limited information the prosecution has introduced about the defendant." *Romano*, 239 F.3d at 1180 (internal quotation marks omitted).

A defendant's desires not to present mitigating evidence do not terminate counsel's responsibilities during the sentencing phase of a death penalty trial: "The reason lawyers may not 'blindly follow' such commands is that although the decision whether to use such evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit." *Blanco*, 943 F.2d at 1502 (internal quotation marks omitted). *See id.* at n.19 ("We note that a defendant's decision concerning the use of mitigating evidence is more an aspect of overall strategy than a decision as to which witnesses would provide the best legal support for a defense."); *see also State v. Hightower*, 518 A.2d 482, 483 (N.J. Super. Ct. App. Div. 1986) (noting that despite competent defendant's preference to simply appeal the guilt determination and forego defense at sentencing hearing, counsel should insist upon presenting any evidence of mitigating factors, because "[i]f the jury did not hear the evidence allegedly in mitigation, it could have difficulty discharging its statutory, and indeed moral, duty" to weigh aggravating and mitigating factors).

Thus, although Mr. Bryan was deemed competent at the constitutionally disfavored, and in this case highly suspect, retrospective competency hearing, *see*

*McGregor v. Gibson*, 248 F.3d 946, 962 (10th Cir. 2001) ("Retrospective competency hearings are generally disfavored.") (internal quotation marks omitted), his opinion about whether or not to present evidence of mental health history during the sentencing phase is assuredly not sacrosanct. The attorney's duty to society may demand that, in narrow sets of circumstances, counsel exercises her independent professional judgment. *See* Evid. Hr'g Tr. at 25 ("My obligation, as trial counsel, . . . is to present the best defense, both in Stage 1 and Stage 2, I can with an eye toward saving my client *no matter what my client's desires are. . . .* I consider the presentation of the insanity defense one of those issues that my co-counsel and I decided which at times would conflict with our client's desires.") (testim. of Steven B. Hess, former counsel) (emphasis added); *id.* at 77 (" I feel that if I have a client that's insisting innocence that, if he chose to, I would put him on the stand and let him testify. . . . But the client has no choice about whether to present a mental health defense. . . . I'll have him testify he's innocent, but I'll present my mental health evidence.") (testim. of Tim Wilson). *See also Hightower*, 518 A.2d at 483 (reversing lower court conclusion that legally competent defendant's wishes should prevail).

    (ii) Tenth Circuit precedent regarding waiver of mitigation evidence

Recently, in *Battenfield v. Gibson*, 236 F.3d 1215, the defendant, Mr. Battenfield, who was deemed competent and had no documented history of

mental distress apart from chemical dependence, instructed his counsel *not* to present any evidence at the sentencing phase of the trial. The available mitigating evidence, as summarized by the court, included:

> (a) evidence that Battenfield's father and grandfather were involved in moonshining, (b) Battenfield's involvement in a serious car accident at age 18, during which he sustained a serious head injury and after which he heavily used alcohol and drugs, *(c) Battenfield's family history of alcoholism and possible drug addiction, (d) mental health evidence, including evidence that Battenfield suffered from substance addiction, (e) the underlying circumstances of Battenfield's previous conviction for assault and battery, which allegedly occurred while he was under the influence of drugs and alcohol and was an act of self-defense,* (f) evidence from family members and friends indicating that Battenfield was known for his compassion, gentleness, and lack of violence, even when provoked, and (g) testimony of prison personnel describing the security where Battenfield would be incarcerated if given a life sentence.

*Id.* at 1226 (emphasis added).

After Mr. Battenfield was found guilty, he instructed his counsel not to present any mitigating evidence in the second stage. His counsel advised him to proceed with the mitigating evidence, and the court made specific inquiries to Mr. Battenfield as to why he was opting not to present any testimony for mitigation. The OCCA determined that Mr. Battenfield voluntarily waived his right to present any mitigating evidence. We noted in terms remarkably descriptive of this case that counsel:

> never explained the general meaning of mitigation evidence to Battenfield or what specific mitigation evidence was available. [Battenfield's counsel] acknowledged *he never advised Battenfield that*

-22-

> *mitigation evidence might include evidence about Battenfield's substance abuse problems.* At best, the evidence indicates that at some point during the trial proceedings, [Battenfield's counsel] discussed with Battenfield his plan to present Battenfield's parents as second-stage witnesses and his strategy to have Battenfield's parents beg for Battenfield's life. In an affidavit submitted in connection with his application for post-conviction relief, Battenfield indicated that [his counsel] never explained to him "*the importance of mitigation or . . . what mitigation actually [wa]s.*" Battenfield Aff. ¶ 2.

*Id.* at 1229 (emphasis added). This bolstered our conclusion that, based on counsel's failure to apprise his client of "what particular mitigating evidence was available in his case," Mr. Battenfield's waiver was not knowing and voluntary. *Id.* at 1232. Judges Briscoe and Lucero thus held for the court that "counsel's deficient performance culminated in Battenfield waiving the right to present mitigating evidence." *Id.* at 1230.

Here, as indicated above, there is a serious question as to Mr. Freeman's level of appreciation for the vast amount of available evidence for mitigation. Unlike in *Battenfield*, Mr. Freeman's investigation was largely completed by his predecessors and Mr. Freeman needed only to connect the dots. But unfortunately for Mr. Bryan, Mr. Freeman arrived at the same spot as did Battenfield's counsel: He was "was unaware at the time of trial of various mitigation strategies and accompanying pieces of evidence that could have been presented during the mitigation phase by [mitigation witnesses]. Further, [counsel] was wholly unprepared to rebut the aggravating factors argued by the

-23-

prosecution." *Id.* at 1129.  And, like counsel in *Battenfield*, Mr. Freeman's

deficient performance "rendered unreasonable his alleged penalty-phase

strategy." *Id.*[5]  In addition, as noted below,  Mr. Freeman's failure to advise

---

[5]  As we noted in *Battenfield,* 236 F.3d at 1233, within months of Mr. Bryan's trial, the OCCA wisely established guidelines for courts to follow "when a defendant refuses to allow the presentation of mitigating evidence in the sentencing stage." *Wallace v. State*, 893 P.2d 504, 512 (Okla. Crim. App. 1995). The guidelines serve as benchmark for the trial court's procedures, and ideally, by trial counsel, when the record is replete with evidence of an organic brain disorder.  Those guidelines, intended to ensure that a defendant "has an understanding of his or her rights . . . in the sentencing process, require a trial court to:

> '(1) inform the defendant of the right to present mitigating evidence, and what mitigating evidence is; (2) inquire both of the defendant and his attorney (if not pro se) whether he or she understands these rights; (3) inquire of the attorney if he or she has attempted to determine from the defendant whether any mitigating evidence exists; (4) *inquire what that mitigating evidence is (if the defendant has refused to cooperate, the attorney must relate that to the court); (5) inquire of a defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence*; (6) after being assured the defendant understands these concepts, inquire of the defendant whether he or she desires to waive the right to present such mitigating evidence; and (7) make findings of fact regarding the defendant's understanding and waiver of rights.'

*Battenfield*, 236 F.3d at 1233 (quoting *Wallace* 893 P.2d at 512-13) (emphasis added).
 These guidelines are "little more than common sense and should have been followed by the trial court."  *Battenfield*, 236 F.3d at 1233.  They demonstrate that, independent of his client's wishes, counsel has the responsibility to evaluate mitigating evidence and inform the trial court.  Similarly, the Supreme Court has

(continued...)

-24-

his client as to the nature, importance, and purpose of the presentation of mitigation evidence, foreclosed any possibility that he might reconsider his position.  *See id.* at 1230.

>           (iii)  The Majority's Misreading of *Romano v. Gibson* and *Wallace v. Ward*

Despite our recent holding in *Battenfield,* the majority relies instead on two of our circuit's cases in support of its conclusion that Mr. Freeman had no choice but to heed the wishes of his client.  Undoubtedly, counsel's strategy will be based in part by the defendant's choices and on information supplied by the defendant.  Thus, concludes the majority, Mr. Freeman's second stage residual doubt strategy was one that was responsive to Mr. Bryan's wishes.  *See* Maj. Op. at 32.

>           (1) *Romano v. Gibson*

In *Romano*, the defendant challenged counsel's effectiveness for failure to present mitigating evidence of abandonment and possible abuse when he was a toddler.  In addition, he contended that he should have received a mental health

---

[5](...continued)
recently reiterated that the ABA Standards for Criminal Justice provide helpful benchmarks for "determining what is reasonable."  *Wiggins v. Smith*, No. 02-311, 2003 WL 21467222, at *9 (U.S. June 26, 2003) (citing *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984)).  The ABA Standards require counsel to inform the court of mitigating evidence.  *See* AMERICAN BAR ASSOCIATION STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, at 183 (1993) ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing.").

examination. A previous report indicated that the defendant "did not suffer from any psychiatric disorders and his test results at that time appeared normal." 239 F.3d at 1182. Before the sentencing stage, the defendant directed counsel not to have his parents and friends testify.

Notwithstanding his client's wishes, trial counsel disregarded his client's instructions, and presented substantial mitigating testimony, including testimony from his mother and various friends. The defendant testified and detailed his childhood, schooling, activities, military service, and his love of children. He described his childhood as "outstanding." *Id.* at 1181. He also told the jury that he "did not like having his friends and family testifying on his behalf and that his defense attorney had presented what mitigating testimony he had against [the defendant's] wishes." *Id.* at 1181-82.

Rather than chide counsel for disregarding his client's directive, we concluded that counsel's performance was a logical strategy to portray the defendant's childhood as normal and happy, and we found no deficiency in his performance. The defendant was allowed to testify and to articulate his discomfort with the testimony presented by his counsel. Finally, through counsel's pretrial preparation, counsel discovered nothing that would suggest an abusive childhood.

Here, Mr. Freeman's "strategy" can hardly be similarly characterized: he severely curtailed Mr. Bryan's testimony at the sentencing stage, allowing him no opportunity to humanize himself before the jury. Unlike counsel in *Romano,* Mr. Freeman was exposed to virtual volumes of evidence of psychiatric disorders, including the scientific "picture" of the SPECT scan. Counsel in *Romano* clearly discussed the sentencing phase with his client and explained his strategy, and opted to allow his client to testify as to his discomfort with having his mother and friends testify. In stark contrast to counsel in *Romano*, Mr. Freeman made no such effort to inform his client about the purposes of the sentencing phases, and did not discuss any mitigation strategy with him. *See* Evid. Hr'g Tr. at 36-37. And finally, given Mr. Bryan's uninformed and likely delusional perspective, Mr. Freeman still opted to heed Mr. Bryan's wishes.

### (2) *Wallace v. Ward*

The majority's reliance on *Wallace v. Ward*, 191 F.3d 1235, is similarly unavailing. In *Wallace*, after the defendant pleaded guilty, he instructed his counsel not to present any evidence at the punishment trial and at the subsequent sentencing. Unlike here, the record indicated that Mr. Wallace "knew what mitigating evidence was, as his attorney discussed it with him. He likewise knew he had the right to present mitigating evidence." 191 F.3d at 1246 (quoting *Wallace v. State*, 935 P.2d 366, 376 (Okla. Crim. App. 1997)). Mr. Wallace was

the only defense witness at the sentencing phase, and he testified that he had conferred with counsel and knew that counsel could have vigorously presented a defense, and that he had instructed counsel not to cross-examine various witnesses or to object to the death penalty, and that he had no desire to present mitigating evidence. *Id.* at 1249. "Defense counsel's closing statement confirmed that he represented [Mr. Wallace's] professed interests." *Id.* We recognized that *Wallace* embodied "unique" facts, and determined that counsel's performance was not deficient and that no prejudice was shown. *Id.* at 1248.

An attorney must weigh in his strategic calculus his client's wishes. *See Romano*, 239 F.3d at 1181. An attorney may disregard those instructions, however, when the record presents evidence that is contrary to the defendant's wishes. Trial counsel can explain any inconsistencies by having her client testify as to her decision. We cannot know with certainty why Mr. Bryan's parents feared exposing the mental illness of their son, nor can we explain Mr. Bryan's unwillingness to concede that he was ever mentally ill. There are clues though. Mr. Bryan's sister indicated that, to her parents, admission of mental illness equated with "someone . . .who had no sense at all." Evid. Hr'g Tr. at 43.

I concede that, absent a determination of incompetence, the autonomy of the client generally prevails at the guilt phase. But at sentencing, the stigma that might be associated by some with an insanity verdict, which may be worse than

-28-

the stigma of conviction, is no longer a potential outcome. *See* Christopher Slobogin and Amy Mashburn, *The Criminal Defense Lawyer's Fiduciary Duty to Clients with Mental Disability,* 68 Fordham L. Rev. 1581, 1633 (2000) (noting that a conviction may be preferable to an insanity verdict because "the stigma associated with an insanity verdict (which incorporates a finding that a crime was committed) may be worse than the stigma of conviction," and may itself lead to institutional confinement).

The Supreme Court has held that the deficiencies borne by the mentally retarded "do not warrant an exemption from criminal sanctions, but diminish their personal culpability." *Atkins,* 536 U.S. at 320. The Court's logic applies no less to those in Mr. Bryan's shoes who suffer from severe mental deficiencies. *See Hardwick*, 320 F.3d at 1164 ("One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.") (internal quotation marks omitted).

"Society has interests both in reliable outcomes and a dignified process, interests that are not waiveable by a defendant. More specifically, society has an interest, independent of the defendant's, in ensuring that the criminal justice system accurately assesses the culpability of those it prosecutes and that its procedures are not ignored or abused." Slobogin and Mashburn, *supra*, 68 Fordham L. Rev. at 1633. Mr. Freeman's failure to recognize that no jury could

accurately assess the culpability of Mr. Bryan without presentation of his mental health history was grossly deficient.

### c. Counsel's Preparation for the Mitigation Phase

The majority also concludes that Mr. Bryan gave counsel an informed decision in part because he was "apprised of the benefits of using mental health evidence in mitigation at the penalty phase." Maj. Op. at 26. The majority reasons that because Mr. Bryan's *previous* counsel, whose strategy was to present mental health evidence during both the guilt and penalty phases in his reliance upon an insanity defense, had explained *that* strategy to his client, that Mr. Bryan would somehow intuit the import of presenting mental health testimony as applied to Mr. Freeman's radically different approach (actual innocence) at both the guilt and sentencing phases. However, Mr. Freeman, whose strategy clearly diverged from that of his predecessors because he planned to assert actual innocence during the guilt phase, did not discuss the strategic implications of presenting mental health evidence during the sentencing phase. *Cf. Romano*, 239 F.3d at 1181.

As to preparation for the sentencing phase, Mr. Bryan testified to the following:

> Q: Could you tell the Court what preparation was made for the penalty phase.

-30-

Mr. Bryan: "That's hard to answer, because there just wasn't any."

Q: Were you told that you would be a witness?
Mr. Bryan: I was told that I would be called to the witness chair.

Q: And when were you told that? When did Mr. Freeman tell you that?
Mr. Bryan: Just a few minutes before I was called.

Q: Did he have any time to prepare you for the questions he was going to ask?
Mr. Bryan: No, sir.

Q: Did you ever discuss with Mr. Freeman the possibility of using mental health evidence in the second stage of the trial?
Mr. Bryan: It was never mentioned.

Evid. Hr'g Tr. at 36-37. Based on this testimony, which neither Mr. Freeman nor the State controverts, we cannot presume that Mr. Bryan had been counseled and advised on the new guilt phase strategy and its implications for the second phase strategy, when the testimony from the hearing indicates otherwise.[6]

---

[6] The ABA's guidelines for capital defense work are "standards to which [the Supreme Court has] long referred to as "'guides to determining what is reasonable.'" *Wiggins*, 2003 WL 21467222, at *9 (quoting *Stricklin*, 466 U.S. at 688). For example, "[p]rior to the sentencing phase . . . counsel should discuss with the client the specific sentencing phase procedures . . . and advise the client of steps being taken in preparation for sentencing." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.11(C) (2003). Similarly,

[c]ounsel at every stage of the case should discuss with the client the content and purpose of the information concerning penalty that they intend to present to the sentencing or reviewing body . . . , means by

(continued...)

-31-

In *Battenfield*, we determined counsel's performance to be deficient where counsel "never explained the general meaning of mitigation evidence to [his client] or what specific mitigation evidence was available." 236 F.3d at 1229. Additionally, counsel in *Battenfield* "never advised Battenfield that mitigation evidence might include evidence about Battenfield's substance abuse problems." *Id.* Mr. Freeman cannot now hide behind Mr. Bryan's uncounseled and uninformed wishes as to the sentencing phase. *See also Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986) ("The reason lawyers may not blindly follow [a client's] commands is that although the decision whether to use such evidence in court is for the client . . . the lawyer first must evaluate potential avenues and advise the client of those offering possible merit.") (internal quotation marks and citation omitted); *see also Martin v. Maggio*, 711 F.2d 1273, 1280 (5th Cir. 1983) (noting that defendant's "instruction that his lawyers obtain an acquittal or the death penalty did not justify his lawyers' failure to investigate the intoxication defense" and that such "[u]ncounseled jailhouse bravado,

---

[6](...continued)
which the mitigation presentation might be strengthened, and the strategy for meeting the prosecution's case in aggravation.

*Id.* § 10.11(D). Furthermore, "[c]ounsel should consider, and discuss with the client, the possible consequences of having the client testify or make a statement to the sentencing . . . body." *Id.* § 10.11(E). Despite these "well-defined norms," *Wiggins*, 2003 WL 21467222, at *9, however, it appears that counsel disregarded such responsibilities.

without more, should not deprive a defendant of his right to counsel's better-informed advice"); *Gaines v. Hopper*, 575 F.2d 1147, 1150 (5th Cir. 1978) ("[M]eaningful discussion with one's client" is one of the "cornerstones of effective assistance of counsel.").

### d. Counsel's "Strategy" at the Sentencing Phase

The majority defends Mr. Freeman's second stage performance by declaring that to present any mental health testimony would be inconsistent with his first stage defense "and would do more harm than good." Maj. Op. at 29. The majority also points to expert testimony that indicates that to have inconsistent first and second stage strategies is unworkable, or, more specifically, the "kiss of death," particularly when there's a "denial defense in the first stage" followed by "remorse and things like that" in the second stage. *See* Maj. Op. at 32 n.22 (quoting testimony of Tim Wilson, Evid. Hr'g Tr. at 60); *see also* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.11 comment. at 107 (2003) ("[W]hether or not the guilt phase defense will be that the defendant did not commit the crime, counsel must be prepared from the outset to make the transition to the penalty phase.").

Neither Mr. Wilson, nor the other experts were suggesting that a mitigation strategy employing this compelling mental evidence should *not* have been used.

Mr. Wilson merely pointed out that the better defense would have been to utilize the mental health evidence in the guilt phase. In any event, the testimony highlighted by the majority merely indicates that he discouraged arguing actual innocence in the first stage, followed by remorse in the second stage. It is simply not correct to suggest that, given the guilt strategy that Mr. Freeman used, that Mr. Wilson would not have utilized this "excellent organic brain damage" evidence in the sentencing phase. Evid. Hr'g at 62. Indeed, former counsel Mr. Hess, the defense expert who *was* asked how he would have "done th[e] second stage differently," answered that he "would have put [the] mental health experts on." Evid. Hr'g Tr. at 23.

In addition, the majority concludes that Mr. Freeman's choice not to present the mental health history at the sentencing stage was reasonable, given his fear of the evidence acting as a two-edged sword. Hampered by these constraints, the majority believes that Mr. Freeman opted "mercy" approach, while the State continues to characterize his "strategy" as one of "reasonable doubt."

(i) Testimony elicited at the sentencing stage

The fairest way to evaluate Mr. Freeman's strategy at sentencing is to review the scant evidence Mr. Freeman *did* present at the mitigation phase, in support of a purported "residual doubt" strategy. *See* Rec. doc. 56, Respondent's

Proposed Findings of Fact and Conclusions of Law ¶ 20 (filed Nov. 10, 1999) ("Freeman relied upon the strategy of 'residual doubt.'"). During the sentencing stage, Mr. Freeman presented brief testimony from Mr. Bryan, his sister, and his mother. First, Mr. Bryan testified to offer an explanation for an alleged assault that took place while he was incarcerated. Next, Mr. Bryan's mother and sister testified that Mr. Bryan had high moral standards, believed in God, was non-violent, and was a caring family member. Mr. Bryan's sister testified that she believed Mr. Bryan might reach a point that "he could be salvaged" and that she "would ask the jury not to execute [her] brother." Trial tr. vol. VII, at 1714. His mother, when asked if she would ask the jury not to kill Mr. Bryan, responded "Why sure." *Id.* at 1728.

Next, Mr. Freeman presented his closing argument, and rather than presenting a vivid portrait of Mr. Bryan's life, he first noted that Mr. Bryan posed no continuing threat to society, because he had served his time for his past conviction. Despite his later comment that he could not present the mental health history evidence because of "incompatib[ility]," with his earlier assertions of Mr. Bryan's innocence, Evid. Hr'g Tr. at 89, he next noted that "[w]e have to remember that the guilt of Leroy is not an issue. You've determined that, we know that, everybody in this courtroom, everybody in the world. The issue is what should be the appropriate punishment." Trial tr. vol. VII, at 1750-51. Mr.

Freeman reminded the jury that Mr. Bryan could "be salvaged despite his vi[le] act." *Id.* at 1752. And despite the fact that "Leroy should not have killed," *id.* at 1753, he asked the jury to impose a sentence of either life or life without parole. This is the extent of the evidence that Mr. Freeman believed he could present in support of any mitigating factors and to counter the government's evidence of aggravators. *See id.* at 1695-1734, 1748-59.

(ii) Presentation of diminished capacity after a guilty verdict

Although Mr. Wilson testified at the evidentiary hearing that his approach to the trial and sentencing stage would have been markedly different from Mr. Freeman's, in that he would have utilized strategies that "dovetail[ed]," he does not suggest a strategy that would have "dovetailed" in any way with Mr. Freeman's guilt phase approach. *See* Evid. Hr'g Tr. at 59-64. Mr. Wilson was suggesting that the *best* approach would have been to introduce the mental health testimony in the first stage. But he should not be read to answer a question that he was not asked, as the majority does. *See* Maj. Op. at 31-32, and n.22.

In *Antwine v. Delo,* 54 F.3d 1357 (8th Cir. 1995), the Eighth Circuit granted habeas relief where counsel failed to investigate fully and present mitigating evidence of the defendant's mental condition. Shortly after the offense, a state psychiatrist conducted a twenty minute interview of Mr. Antwine

-36-

and "concluded that [he] did not suffer from any mental disease or defect, and that his actions at the time of the offense were consistent with PCP intoxication." *Id.* at 1365. Several years later, Mr. Antwine was diagnosed with bipolar disorder. The Missouri state court concluded that the evidence of mental defect was insufficient to establish that the defendant suffered from bipolar disorder at the time of the offense. In addition, the court found that the diagnosis was not credible.

Counsel for Mr. Antwine defended his decision not to conduct followup mental examination because it might only show diminished capacity in a bid for a lesser offense, like second degree murder. Mr. Antwine instructed his counsel to seek "acquittal rather than a reduced sentence, [and] counsel decided not to investigate or pursue a diminished capacity defense." *Id.* at 1366. Mr. Antwine's counsel "gave no reason, though, for not requesting a second examination in preparation for the penalty phase of the capital murder trial." *Id.*

At the sentencing phase, counsel relied only on a plea for mercy and presented only the testimony of the defendant's brother. Counsel later testified "that he had considered putting on elaborate evidence of mitigation, but had rejected the idea in favor of an emotional beg-for-mercy approach. He was concerned that the guilty verdict indicated that the jury had decided to give [his client] the death penalty, and felt that the best course would be an appeal to their

compassion." *Id.* at 1367. Mr. Antwine's counsel also claimed "that he would have lost credibility if he had presented evidence of a mental impairment at the penalty phase, because such evidence would be inconsistent with the self-defense claim presented in the guilt phase." *Id.*

Mr. Antwine's counsel's performance managed to meet the *Strickland* standard at the guilt phase, because Mr. Antwine could not establish prejudice: "If [Antwine's] counsel had . . . presented evidence that [his client] was in the throes of a manic episode during the offense, the jury might have found that he did not have the specific intent – cool deliberation – required for capital murder." *Id.* at 1368. But the court could not say "that it was unreasonable of counsel not to make a diminished capacity argument in the guilt phase." *Id.*

As to the sentencing phase, however, the court held that "there [wa]s a reasonable chance that Antwine would not have been sentenced to death if counsel had effectively presented evidence of Antwine's mental impairment at the penalty phase." *Id.* "Since the jury found only two aggravating circumstances, the balance of aggravating and mitigating circumstances in the penalty phase of the trial would have been altered enough to create a reasonable probability that the jury would not sentence Antwine to death." *Id.*

The *Antwine* court dealt with issues that parallel those before us. First, Mr. Antwine's counsel stated that his client's goal was acquittal, and thus

counsel opted not to present evidence of mental impairment at either the guilt or sentencing phase. Here, Mr. Bryan did not want his lawyer to present evidence of mental illness. Additionally, Mr. Bryan rejected the idea of pleading guilty.

Second, Mr. Antwine's counsel believed he would have lost credibility if he had presented evidence of mental impairment because such evidence would be inconsistent with the self-defense claim. Here, Mr. Freeman testified that "[a]ny other position" apart from the one he took "would have been incompatible" with his first stage strategy that Mr. Bryan did not commit the crime. Evid. Hr'g Tr. at 89.

Here, in fact, the rationale for a finding Mr. Freeman's performance to constitute ineffective assistance of counsel under *Strickland* is much stronger than *Antwine:* In *Antwine*, counsel was deemed ineffective for not ordering subsequent mental evaluations that *might* have determined the defendant suffered from an episode during the time of the offense. We, however, do not need to speculate as to what the evaluations of Mr. Bryan might have said – we know Mr. Bryan has suffered from serious mental defects for several years, and that he continues to suffer from them. Thus, I would hold that Mr. Freeman's sentencing phase "strategy" was no strategy at all – and that his failure to present evidence of Mr. Bryan's mental health history was deficient under *Strickland.*

(iii) Residual Doubt Strategy

-39-

Perhaps even more striking is the State's defense of the reasonableness of Mr. Freeman's purported residual doubt strategy at sentencing. There is no question that "[t]he guilt phase may . . . provide the opportunity to sow the seeds of 'residual' doubt concerning the defendant's guilt, enhancing the chances of a life sentence." James M. Doyle, *The Lawyer's Act: Representation in Capital Cases*, 8 Yale J. L. & Human. 417, 423 n.25 (1996). Counsel may further attempt to stir up any lingering doubt concerning the guilt of the defendant during the sentencing phase, hoping to cause the jury to decide against the imposition of the death penalty. Residual, or "lingering," doubt has been defined as "(1) actual, reasonable doubt about guilt of any crime; (2) actual, reasonable doubt that defendant was guilty of a capital offense, as opposed to other offenses; (3) a small degree of doubt about (1) or (2), sufficient to cause the juror not to want to foreclose (by execution) the possibility that new evidence might appear in the future." Christina S. Pignatelli, *Residual Doubt: It's a Life Saver*, 13 Capital Defense Journal 307, 307-08 (2001) (internal quotation marks omitted).

Thus, the utilization of the "residual doubt" strategy can be an effective form of mitigation. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1563 (1998) ("'[T]he best thing a capital defendant can do to improve his chances of receiving a life sentence . . . is to raise doubt about his guilt.'"). However, there is no

evidence that Mr. Freeman made use of such a strategy or tried to raise any doubt about his client's guilt.

A "strategy" is defined as "a careful plan or method," or "a clever stratagem." Merriam Webster's Collegiate Dictionary 1162 (10th ed. 1997). Mr. Freeman never used the terms "lingering" or "residual doubt" during the sentencing hearing. Mr. Freeman did not even use the term "doubt" at the hearing. Mr. Freeman admitted he was not familiar with the term "residual doubt" until after the trial. *See* Evid. Hr'g Tr. at 106. Mr. Freeman never planned nor asserted a residual doubt defense. He was not consciously aware of relying on a residual doubt strategy at the sentencing trial, and never asserted the use of a residual doubt strategy until he was deposed.

There was no testimony or reminder given to the jury during the sentencing phase regarding Mr. Bryan's potential innocence. The concept of a residual doubt strategy makes sense when there is a chance of mistaken identification, or when the guilt of others is implicated, such as in the case where there is a codefendant. *See* Evid. Hr'g Tr. at 65 (Testim. of Tim Wilson); *see generally* Margery Malkin Koosed, *The Proposed Innocence Protection Act Won't–Unless it Also Curbs Mistaken Eyewitness Identifications,* 63 Ohio St. L.J. 263, 313 n.44 (2002) (suggesting increased use of lingering doubt theory when suggestive identification procedure is at issue).

A decision to pursue a lingering doubt strategy at the penalty phase, to the exclusion of other strategies, should be granted wide deference, especially if mitigating evidence is presented that complements that strategy. However, Mr. Freeman presented no such evidence suggesting anything that might lessen Mr. Bryan's responsibility for the offense or to raise doubt about Mr. Bryan's guilt.[7] Mr. Freeman relied upon and reiterated little, if any, evidence from the guilt phase that might have cast doubt upon Mr. Bryan's guilt. Instead, Mr. Freeman went to the opposite extreme. Mr. Freeman admitted that Mr. Bryan "should not have killed" that he should not have committed this "vile act." Mr. Freeman thus erased any doubt that might have weighed on the jury's conscience. If the jurors had retained any residual doubts, Mr. Freeman extinguished them.

The OCCA determined that it would not second guess Mr. Freeman's sentencing phase strategy where, "[a]ccording to the instruction on mitigating evidence, [Mr.] Bryan still appeared to be claiming actual innocence," *Bryan v. State*, 935 P.2d 338, 363 (Okla. Crim. App. 1996), and effectively shielded Mr. Freeman's performance from scrutiny. Similarly, the district court defended Mr. Freeman's sentencing phase strategy and declared "Mr. Freeman's decision was

---

[7] When asked about his sentencing phase preparation, Mr. Freeman testified that when he asked Mr. Bryan's family about Mr. Bryan, they stated "that [Mr. Bryan] had been a beautiful, good son, and had accomplished a great deal in society by becoming a teacher." Evid. Hr'g Tr. at 88. Mr. Freeman elicited no such testimony during the sentencing phase.

-42-

correct or at least professionally reasonable." Dist. Ct. Order at 65. I don't understand how the OCCA and the district court could be so charitable when Mr. Freeman admitted that Mr. Bryan "killed" and committed a "vile act."

It is certainly possible that a lawyer can present the elements of a defense without knowing that there is a specific name for her strategy. Creative minds can, indeed, devise strategies that others have reached via different paths. I believe, however, that to credit Mr. Freeman with having relied upon a strategy of residual doubt, where the evidence strongly suggests that he was unaware such a strategy even existed—and where his actions completely undermined that defense— is untenable. Mr. Freeman's performance cannot be construed so that it is "considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks and citation omitted). *Strickland* counsels deference to plausible legal strategies, not to unilateral disarmament. *See Wiggins*, 2003 WL 21467222, at *10 (in holding that the petitioner demonstrated ineffective assistance of counsel, noting that counsel put on a "half-hearted mitigation case," and concluding that "the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post-hoc* rationalization of counsel's conduct that an accurate description of their deliberations prior to sentencing").

> (iv) Characterizing the mental health evidence as a two-edged sword

The OCCA also defended Mr. Freeman's decision not to present mental health evidence because "[g]iven the other evidence of violent behavior, the jury could have thought this type of psychological problem indicated a propensity for future violence." 935 P.2d at 343. Again, *Battenfield* provides a useful analogy. There, the OCCA determined that, as to the history of Mr. Battenfield's drug use, "[t]he psychologist's conclusion that Battenfield was chemically dependent does nothing to undermine our confidence in the jury's determination that he constitutes a continuing threat to society." 236 F.3d at 1227 (quoting *Battenfield v. State*, 953 P.2d 1123, 1147 (Okla. Crim. App. (1998)). We noted, however, that evidence of Mr. Battenfield's drug and alcohol reliance, and his potential treatment for such reliance, might blunt the force of the continuing threat aggravator. *See id.* at 1235.

The same is true here. Had the jury been given more information about Mr. Bryan's background, mental health and treatment history,[8] and the facts surrounding his previous conviction, which would heighten the jury's sensitivity

---

[8] We also note that the jury heard nothing regarding how voluntary or involuntary treatment with anti-psychotic drugs might blunt the force of the continuing threat aggravator. Based on the record before us, we are unable to discern the necessity of the forced administration of anti-psychotic drugs such as Navane, except to note that "[t]here are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds [such as related to the individual's dangerousness or to the individual's own interests]." *Sell v. United States*, 121 S. Ct. 2174, 2185 (2003).

to the ingrained nature of his organic disease, there is a reasonable probability that the jury would not have sentenced Mr. Bryan to death, because the jury had the option of sentencing Mr. Bryan to life without parole.

The decision not to put forth mental health evidence may sometimes be characterized as strategic. *See Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (noting presence of "two-edged sword" where counsel presented "substantial" mitigating evidence and where mental health evidence would have "displaced rather than supplemented" the mitigating evidence, such that petitioner could not establish prejudice); *see also Atkins*, 536 U.S. at 320-21 (recognizing that evidence of mental retardation may enhance likelihood of finding of future dangerousness aggravator, and noting that "[m]entally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes"). However, surely the majority does not suggest that any time counsel foregoes the presentation of mitigating evidence that may be viewed to support an aggravator, such as evidence of mental illness, evidence of alcohol abuse, or evidence of an abusive upbringing, that he is assured blanket protection from review of his effectiveness. *See* Maj. Op. at 31. To do so would be to arm counsel with a two-edged sword.

The Supreme Court's most fundamental direction regarding the presentation of mitigating evidence at sentencing demands that "precisely because the punishment should be directly related to the personal culpability of the defendant," the jury must be allowed to consider all relevant mitigating evidence. *Penry v. Lynaugh*, 492 U.S. 302, 318, 327-28 (1989). In a case such as this, where the mitigating evidence that was actually presented was scant at best, where counsel knew his client would make a poor witness because his delusional state precluded him from being able to beg for mercy or to express remorse, and where the mental health evidence is well-documented and long-standing, Mr. Freeman's performance left the jury no reason even to consider as a possibility that Mr. Bryan might not be morally culpable enough, as the result of his involuntarily adduced organic brain disorder, for the death penalty.

(iv) *Post hoc* "mercy" approach

The majority characterizes Mr. Freeman's sentencing strategy as a "mercy approach." Maj. Op. at 34. Again, I do not think it is appropriate for the court to supply a "*post hoc* rationalization" for Mr. Freeman. *Wiggins*, 2003 21467222, at *10 (rejecting state courts' characterization of defense counsel's "halfhearted mitigation case" approach as a "strategic decision"). Even if his beleaguered presentation at sentencing can be deemed as seeking mercy, though, the presentation was unreasonably flawed. "As a practical matter, the defendant

-46-

probably has little or no chance of avoiding the death sentence unless the defense counsel gives the jury something to counter both the horror of the crime and the limited information the prosecution has introduced about the defendant." Jonathan P. Tomes, *Damned if You Do, Damned if You Don't: The Use of Mitigation Experts in Death Penalty Litigation*, 24 Am. J. Crim. L. 359, 364 (1997). I find it difficult to ascribe to Mr. Freeman the act of seeking mercy in the same sentence that he denounced Mr. Bryan's "vile act." Mr. Freeman failed to provide any individual portrayal of Mr. Bryan's life, a portrayal that might have included testimony about his being a college graduate, a high school teacher, a man who was married and who began to suffer headaches, which signaled the onset of his debilitating organic brain damage.

Asking for mercy requires some attempt to invoke compassion, a sympathetic response of the jurors to explain those acts. *See, e.g.,* Anthony V. Alfieri, *Mitigation, Mercy, and Delay: The Moral Politics of Death Penalty Abolitionists*, 31 Harv. C.R.-C.L. L. Rev. 325, 327 (1996) ("During the penalty or sentencing phase of capital trials, lawyers present mitigating evidence of client psycho-social deprivation to the jury in an attempt to explain specific violent acts of criminal lawbreaking and, thus, invite mercy."); Stephen P. Garvey, *supra*, 98 Colum. L. Rev. at 1539 ("On the side of mitigation, jurors tend to focus most on factors that *diminish the defendant's individual responsibility* for his actions.

They attach significant mitigating potential to facts and circumstances that show diminished mental capacity, such as mental disturbance at the time of the offense (emphasis added); *id.* ("[Jurors] show little mercy to defendants who show no remorse."). The majority's holding essentially insulates counsel's sentencing phase performance by supplying counsel with yet another justification for a nonexistent strategy, not unlike the *post hoc* attempt to explain away Mr. Freeman's guilt-affirming sentencing performance by calling it a "residual doubt" strategy.

Because Mr. Freeman made no attempt to provide the jury with the "particularized nature of the crime and the particularized characteristics of the individual defendant," *Gregg*, 428 U.S. at 206, I cannot agree that he applied any strategy at all at the sentencing phase.

### B. Prejudice

As stated in the panel dissent, that Mr. Freeman's deficient performance resulted in fundamental prejudice is obvious. *See* 276 P.2d at 1185 (Henry, J., dissenting).

"[T]he death penalty is different in both its severity and its finality." *Neill v. Gibson*, 278 F.3d 1044, 1068 (10th Cir. 1998). "From the point of view of society, the action of the sovereign in taking the life of one of its citizens . . .

-48-

differs dramatically from any other legitimate state action." *Id.* "[A] difference exists when a defendant's life is at stake. 'In death cases, doubts with regard to the prejudicial effect of trial error should be resolved in favor of the accused.'" *Moore v. Reynolds*, 153 F.3d 1086, 1118 (10th Cir. 1998) (Brorby, J., dissenting) (quoting *Andres v. United States*, 333 U.S. 740, 752 (1948)). "It is neither possible nor desirable for a person to whom the state entrusts [such] an important judgment to decide in a vacuum." *Barclay v. Florida*, 463 U.S. 939, 950 (1983).

Psychiatric mitigating evidence "has the potential to totally change the evidentiary picture." *Middleton v. Dugger*, 849 F.2d 491, 495 (11th Cir. 1988); *see also Stephens v. Kemp*, 846 F.2d 642, 653 (11th Cir. 1988) (stating that "prejudice is clear" where attorney failed to present evidence that defendant spent time in mental hospital). Here, we have testimony from two psychiatrists as to Mr. Bryan's delusions and his organic brain disorder, and a SPECT scan to verify these clinical observations. We have hospitalization records documenting his disorder. We have testimony from his previous attorneys regarding his illness. We have Mr. Bryan's own delusions and fantastic stories and his refusal to admit he has ever been afflicted mentally. And we have the observation that his condition was apparently so grave that one expert stated it "place[d] into serious question his competency to stand trial, as well as his legal culpability in the crimes for which he is charged." Evid. Hr'g Tr. at 95.

The compelling and extensive evidence of Mr. Bryan's history of mental illness creates a reasonable probability that the jury would have concluded that the mitigating evidence outweighed the continuing threat aggravator and might also be viewed in a mitigating light as to past violent behavior. *See Battenfield*, 236 F.3d at 1235 (concluding that had mitigating evidence, which included defendant's reliance on drugs and alcohol and mental health evidence, been presented to jury, there was a reasonable probability that the jury would have not have given defendant the death penalty); *Antwine*, 54 F.3d 1368 (holding that presentation of defendant's mental impairment would alter the balance of aggravating and mitigating circumstances in the penalty phase of the trial . . . enough to create a reasonable probability that the jury would not sentence [Mr.] Antwine to death").

This evidence could have materially altered the balance of aggravating and mitigating factors underlying the jury's sentencing decision. The failure to present the evidence deprived the jury of a "vehicle for expressing its 'reasoned moral response'" to the substantial evidence of Mr. Bryan's mental illnesses when it rendered its sentencing decision. *Penry*, 492 U.S. at 328. Accordingly, there is a substantial probability the jury, or that at least one juror, would have determined that the mitigating circumstances outweighed the aggravating circumstances. *See Wiggins*, 2003 WL 21467222, at *17 (holding that prejudice

had been established where counsel presented only one significant mitigating factor, noting that, "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance"). Mr. Freeman's performance "'so undermined the proper functioning of the adversarial process that the [penalty phase of] of the trial cannot be relied on as having produced a just result.'" *Battenfield*, 236 F.3d at 1235 (quoting *Strickland*, 466 U.S. at 686).

### III. CONCLUSION

The majority's conclusion revolves around the Supreme Court's statement that "'[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statement or actions. Counsel's action are usually based, quite properly, on *informed strategic choices made by the defendant* and on information supplied by the defendant.'" Maj. Op. at 23-24 (quoting *Strickland,* 466 U.S. at 691) (emphasis added). I simply cannot agree that Mr. Bryan made an informed strategic choice when his counsel decided to forego presentation of any mental defect evidence at the sentencing stage. Mr. Freeman did not ever know what use he could have made of the mental health testimony. He claims to have felt constrained by the wishes of his client's family

-51-

and by his client to submerge any indication of mental distress in the Bryan family, and rather than discuss the purpose of the sentencing phases and of mitigating evidence generally with his client, he limited his discussion to merely informing his client that he would be testifying *minutes* later. And finally, in an inconceivable decision that completely destroyed any consistency between the guilt and sentencing phases, Mr. Freeman assured the jury of his client's guilt and added his own condemnation of Mr. Bryan's act.

In its recent and historic decision that declared the execution of mentally retarded defendants unconstitutional, the Supreme Court observed that

> [m]entally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins,* 536 U.S. at 318 (footnotes omitted). The OCCA has acknowledged the direction of the Supreme Court's capital punishment jurisprudence and concluded that "while mentally retarded individuals are capable of committing crimes in Oklahoma, in light of *Atkins*, those who fit within its holding are no longer eligible for the death penalty." *Murphy*, 54 P.3d at 567. The OCCA has further

acknowledged the Supreme Court's holding that "'[c]onstruing and applying the Eighth Amendment in the light of our evolving standards of decency, we therefore conclude that such punishment is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender.'" *Id.* at n.15 (quoting *Atkins*, 536 U.S. at 321).

I believe that others too can be "competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider." *Blanco*, 943 F.2d at 1503. Or, as even Mr. Freeman should have understood, whether Mr. Bryan was "insane" or not, he was clearly, as both Drs. Smith and Murphy colorfully concluded, "crazy." I hope that the State of Oklahoma will reflect on these matters and consider settling this case by either agreeing to a new sentencing phase where a fairly composed jury can evaluate this compelling evidence or by renewing its offer of life imprisonment with no possibility of parole. The prosecution's victory on appeal does not eliminate its obligation on an ongoing basis to conscientiously review whether to exercise prosecutorial discretion.[9]

---

[9] *See, e.g.*, Henry Weinstein, *California Appeal Lost, Yet Freedom Won: A dissenting opinion was so persuasive that prosecutors dropped the case that convicted a man of immigrant smuggling*, L.A. Times, Metro Section (Apr. 23, 2003) (discussing *United States v. Ramirez-Lopez*, 315 F.3d 1143, 1160-76 (9th Cir. 2003) (Kozinski, J., dissenting), *opinion withdrawn and appeal dismissed*, 327 F.3d 829 (2003)).

I do not quarrel with Mr. Bryan's guilt; his crime and his irreversible brain damage justify lifelong incarceration and treatment.  But our Constitution does not permit us to sentence this man to death without at least allowing a jury to consider evidence of his diseased mental state.

I would therefore reverse the judgment of the district court and remand with instructions that the district court grant the writ as to Mr. Bryan's death sentence, subject to the state district court conducting a new sentencing trial.